### 39500. ODOM et al. v. UNION CITY DOWNTOWN DEVELOPMENT AUTHORITY et al.

BELL, Justice.

This case concerns a taxpayer's challenge to a municipality's attempt to use the Downtown Development Authorities Law, OCGA Ch. 36-42 (Code Ann. § 69-1501b et seq.), (the DDAL) to finance street improvements and construction and refurbishing of governmental buildings.

On November 17, 1981 the mayor and city council of the City of Union City (the City) resolved pursuant to OCGA § 36-42-5 (Code Ann. § 69-1503b) to activate the Union City Downtown Development Authority (the Authority), and on December 1, 1981 the City further resolved to send the Authority a letter of inducement to proceed with plans to make certain municipal improvements desired by the City. In response, on January 4, 1982 the Authority issued a written letter of inducement to the City by which it proposed to issue bonds under the DDAL in order to finance the municipal improvements. These improvements, referred to collectively by the parties as "the Project," included construction of a new city hall, refurbishing of the existing city hall for use as a police station and jail,

and improvement of city streets. On January 11 the City resolved to accept the terms and conditions in the proposal.

On March 1, 1982, appellants Roslyn Odom and Gail Wallace, City taxpayers, filed suit against the City and the Authority to obtain a declaration that the Project is not authorized by law and to enjoin the City and the Authority from proceeding with it. The appellees subsequently agreed by consent order to forbear from proceeding with the Project pending final adjudication of this case. Appellants moved for summary judgment on the ground that the Project was illegal and ultra vires, and appellees countered with their own motion for summary judgment. On September 16, 1982 the trial court issued an order denying appellants' motion and granting appellees', in which it concluded "that the Downtown Development Authority Act was not unconstitutionally applied under the stipulated facts and circumstances of this case and that such actions are not ultra vires." Odom and Wallace appeal.

Appellants raise several enumerations of error, but we confine our consideration to their first enumeration, as it is dispositive of the case. In essence, they contend the Project is not a constitutionally authorized applicaton of the DDAL. We agree with their contention and reverse.

In 1981 the General Assembly enacted the DDAL. Ga. L. 1981, p. 1744. Regarding the legislative purpose of that act, the DDAL declares that the "revitalization and redevelopment of the central business districts of the municipal corporations of this state develop and promote for the public good and general welfare trade, commerce, industry, and employment opportunities and promote the general welfare of this state by creating a climate favorable to the location of new industry, trade, and commerce and the development of existing industry, trade, and commerce within the municipal corporations of this state. Revitalization and redevelopment of central business districts by financing projects under this chapter will develop and promote for the public good and the general welfare trade, commerce, industry, and employment opportunities and will promote the general welfare of this state. It is, therefore, in the public interest and is vital to the public welfare of the people of this state, and it is declared to be the public purpose of this chapter, so to revitalize and redevelop the central business districts of the municipal corporations of this state." OCGA § 36-42-2 (Code Ann. § 69-1509b).

The types of projects which the DDAL purports to authorize to serve this public purpose are delineated in OCGA § 36-42-3 (6) (Code Ann. § 69-1501b): "As used in this chapter, the term . . . 'Project' means the acquisition, construction, installation, modification,

renovation or rehabilitation of land, interests in land, buildings, structures, facilities, or other improvements located or to be located within the downtown development area, and the acquisition, installation, modification, renovation, rehabilitation, or furnishing of fixtures, machinery, equipment, furniture, or other property of any nature whatsoever used on, in, or in connection with any such land, interest in land, building, structure, facility, or other improvement, all for the essential public purpose of the development of trade, commerce, industry, and employment opportunities in the downtown development area. A project may be for any industrial, commercial, business, office, parking, public, or other use, provided that a majority of the members of the authority determine, by a duly adopted resolution, that the project and such use thereof would further the public purpose of this chapter."

The construction of a new city hall, the refurbishing of an existing city building into a jail and police station, and the improvement of city streets are all obviously projects which are for public use. Furthermore, such projects are in the public interest, and tend to promote the public good and general welfare. Thus, if just the literal wording of the DDAL is considered, it might appear that appellees' project falls within the ambit of the DDAL. However, as we conclude below, the apparent broad scope of the DDAL is significantly limited by the narrower breadth of the constitutional provision pursuant to which it was enacted.

1) The DDAL itself provides no express guidance as to the constitutional source of legislative jurisdiction which was relied upon by the General Assembly. Instead, Ch. 36-42's enacting clause states in a general manner that, "This chapter is enacted pursuant to authority granted the General Assembly by the Constitution of Georgia." OCGA § 36-42-13 (Code Ann. § 69-1512b).

One possible interpretation is that this section's sentence refers solely to 1983 Ga. Const. Art. IX, Sec. VI, Par. III (Code Ann. § 2-5303), which provides in relevant part that, "The development of trade, commerce, industry, and employment opportunities being a public purpose vital to the welfare of the people of this state, the General Assembly may create development authorities to promote and further such purposes or may authorize the creation of such an authority by any county or municipality or combination thereof under such uniform terms and conditions as it may deem necessary."

Appellees take a different view. They argue that even if the Project is not authorized by Art. IX, Sec. VI, Par. III, it is nevertheless mandated by the very broad provision of 1983 Ga. Const. Art. IX, Sec. III, Par. I (a) (Code Ann. § 2-5001), which states, "The state, or

any institution, department, or other agency thereof, and any county, municipality, school district, or other political subdivision of the state may contract for any period not exceeding 50 years with each other or with any other public agency, public corporation, or public authority for joint services, or facilities which the contracting parties are authorized by law to undertake or provide."[1] We disagree. Although OCGA § 36-42-13 (Code Ann. § 69-1512b) could be interpreted as indicating that the DDAL draws on any applicable constitutional provision for its authority, such an interpretation lacks support in the constitutional and statutory history of industrial development authorities.

Prior to 1963, industrial development authorities were created in piecemeal fashion. See, e.g., *Smith v. State,* 217 Ga. 94 (121 SE2d 113) (1961) (local constitutional amendment). In 1963 the Industrial Development Authorities Law was enacted, Ga. L. 1963, p. 531, creating a statewide system of local development authorities. Under the act these authorities could be activated by local resolution without additional legislative action, a feature which seems to have been aimed at establishing a quicker and less complex procedure whereby local governments could obtain the use of development bonds to induce industry to relocate in their areas.

Certain other aspects of the law are notable. Although the act had no enacting clause, Art. IX, Sec. III, Par. I was its only existing possible source of constitutional authority, and legislative jurisdiction for the act must have been premised upon that paragraph. Also, even though that constitutional paragraph arguably authorizes the General Assembly to empower authorities to finance projects for any public purpose, the range of permissible projects under the Industrial Development Authorities Law was relatively narrow in scope.

In 1968 the General Assembly proposed a constitutional amendment which eventually became Art. IX, Sec. VI, Par. III. Ga. L. 1968, p. 1606. The language of this amendment is unlike the general wording of Art. IX, Sec. III, Par. I, since it is specifically concerned with the creation of development authorities. The two constitutional provisions are also dissimilar in that the range of permissible projects under Sec. VI, Par. III, does not extend nearly so far as the range of

---

[1] 1983 Ga. Const. Art. IX, Sec. III, Par. I has been interpreted by this court as sufficiently broad to mandate authority financing of, for example, public schools, *Sheffield v. State School Bldg. Auth.,* 208 Ga. 575 (68 SE2d 590) (1952), and civic centers, *Frazer v. City of Albany,* 245 Ga. 399 (265 SE2d 581) (1980). It should be noted that our opinion in the instant case does not affect the constitutionality of authority projects undertaken pursuant to Art. IX, Sec. III, Par. I.

Sec. III, Par. I.

To implement Sec. VI, Par. III, the Development Authorities Law (DAL), OCGA Ch. 36-62 (Code Ann. § 69-1501 et seq.) (Ga. L. 1969, p. 137), was enacted. Several aspects of that law are particularly relevant to our analysis. First, it repealed the Industrial Development Authorities Law, but continued in existence any previously created authorities. Ga. L. 1969, § 12. Second, its enacting clause expressly relied upon the new development authorities' amendment, and no other. Third, its subject matter and scope were substantially similar to those of the relatively narrow law which it repealed. In this latter regard, the DDAL's range of permissible projects has subsequently been enlarged by amendment; however, even now it does not allow financing of all types of commercial projects, and thus is not as broad as Sec. VI, Art. III would permit. *Day v. Development Auth. of the City of Adel,* 248 Ga. 488 (284 SE2d 275) (1981). See *Development Auth. of DeKalb County v. Beverly Enterprises,* 247 Ga. 64 (274 SE2d 324) (1981).

In 1981 the DDAL, Ga. L. 1981, p. 1744, was enacted to assist cities in redeveloping their decaying business districts. OCGA § 36-42-2 (Code Ann. § 69-1509b). The DDAL expands the scope of permissible authority projects beyond that of the DAL to include all types of commercial projects. OCGA § 36-42-3 (6) (Code Ann. § 69-1501b). This expansion obviously stemmed from the legislative recognition that much of downtown business tends to consist of commerce, and that the effectiveness of the authorities in revitalizing downtown areas would be diminished if they were unable to dangle the lure of revenue financing before the full range of retail and wholesale business. However, the DDAL otherwise closely resembles the DAL in design and purpose.

Because a careful review of the history of this area shows that the legislature has heretofore restricted the scope of projects permissible under development authorities, we find that neither the increased breadth of the DDAL in comparison with the uniform industrial development authority statutes which preceded it, nor the apparently broad language of the DDAL's enacting and definitions clauses, are sufficiently definite indications that the General Assembly intended to undertake a radical departure from its previous cautious approach and grant local governments unbridled power to finance all their public works through downtown development authorities. Therefore, we will not interpret the DDAL in the manner proposed by appellees.

Appellees argue that consideration of *Frazer v. City of Albany,* 245 Ga. 399 (265 SE2d 581) (1980), should lead us to a different conclusion. In that case, we held that local legislation establishing the

Albany-Dougherty Inner-City Authority, Ga. L. 1977, p. 4220, was expressly authorized by the 1983 Ga. Const. Art. IX, Sec. III, Par. I,[2] and that a proposed civic center was a proper project for the Authority to finance.

However, *Frazer* is distinguishable. Although the statute in *Frazer* bears some similarity to the DDAL, it is nevertheless only a local enactment which forms no part of the gradual legislative development and adaptation of the concept of a statewide, uniform system of industrial development authorities. Therefore, it can have no significant role to play in the interpretation of the DDAL, which is part of that system, and accordingly the conclusions reached in *Frazer* do not control our decision today.

For the above reasons, we conclude that the Downtown Development Authorities Law is solely based upon Art. IX, Sec. VI, Par. III.

2) Whether an application of the DDAL exceeds Art. IX, Sec. VI, Par. III is a question of first impression. The language of OCGA § 36-42-3 (6) (Code Ann. § 69-1501b) substantially tracks Art. IX, Sec. VI, Par. III, in that it states that DDAL projects are intended to promote "the essential public purpose of the development of trade, commerce, industry, and employment opportunities in the downtown development area." However, that code section's language is not limited to the constitutionally enumerated classes of projects, but goes on to add, "A project may be for any industrial, commercial, business, office, parking, *public, or other use,* provided that a majority of the members of the authority determine . . . that the project and such use thereof would further the public purpose of this chapter." OCGA § 36-42-3 (6) (Code Ann. § 69-1501b). (Emphasis supplied.)

We have observed elsewhere that Art. IX, Sec. VI, Par. III is "very broad and general," *Development Auth. of DeKalb County,* supra at 66, but Paragraph III is not so broadly drafted that it authorizes any project which would serve a public use or promote the public welfare. Because it is not so phrased, and because the General Assembly can add nothing to its scope through the language of the DDAL, we must instead examine the Project to see whether it falls within the purview of Art. IX, Sec. VI, Par. III's enumerated eligible

---

[2] Ga. L. 1977, p. 4220 contains no enacting clause, and therefore does not expressly indicate the part of the constitution which the Assembly thought was the source of its jurisdiction to pass that law. Our conclusion in *Frazer* that the act was expressly authorized by Art. IX, Sec. III, Par. I was reached without discussion of this aspect of the statute.

classes of projects.

We dealt with an analogous issue in *Development Auth. of DeKalb County v. Beverly Enterprises,* supra. In that case we considered whether a certain class of projects authorized by the Development Authorities Law, § OCGA 36-62-2 (6) (K) (Code Ann. § 69-1509b), was an eligible class under Art. IX, Sec. VI, Par. III. We said that the projects in question, skilled nursing homes, did not have to be expressly listed in the constitution, provided that they furthered the development of trade, commerce, industry or employment opportunities. *Development Auth. of DeKalb County,* supra at 65-66. We then held that the term "nursing home" appeared to fit within the definition of "industry," and therefore OCGA § 36-62-2 (6) (K) (Code Ann. § 69-1509b) was not contrary to Art. IX, Sec. VI, Par. III.

In the instant case, it is clear that the Project does not fall within the meaning of "trade," "commerce," or "industry." The terms "trade" and "commerce," when used in juxtaposition, have been defined "to include practically every business occupation carried on for subsistence or profit, and into which the elements of bargain and sale, barter, exchange, or traffic, enter." Black's Law Dictionary, (4th Ed. 1968) p. 1665. We have previously noted that "industry" has been defined as " 'any department or branch of art, occupation, or business conducted as a means of livelihood or for profit; especially, one which employs much labor and capital and is a distinct branch of trade.' " *Development Auth. of DeKalb County,* supra at 66. "Employment" signifies, "[t]he act of hiring [cit.] implying a request and a contract for compensation." Black's, supra at 618.

"It is an elementary rule of construction that when the words of a statute are plain and unambiguous, and their meaning so obvious so as to eliminate any need for construction, it is the duty of the court to give expression to the obvious meaning of the General Assembly." *Irwin v. Busbee,* 241 Ga. 567 (247 SE2d 103) (1978). The same rule is applicable to constitutional provisions. *Jones v. Darby,* 174 Ga. 71 (161 SE 835) (1931). This Project is designed to fulfill the governmental functions of improving streets and of providing facilities for municipal administration and police and jail services. Accordingly, it does not appear to fit within the definitions of commerce, trade, or industry.

Nevertheless, appellees argue that the Project falls within the parameters of Art. IX, Sec. VI, Par. III, because it is intended to develop employment opportunities by enhancing the general business climate and inducing the development of trade, commerce, and industry in the City's downtown business district.

Although the Project arguably would provide employment opportunities both in the course of its construction and operation and

also within the trade, commerce, and industry the Project is designed to lure in the City, under the familiar rule of construction of *noscitur a sociis, Mott v. Central Railroad,* 70 Ga. 680, 683 (1883), we interpret the general term "employment opportunities" in Art. IX, Sec. VI, Par. III to be limited by its antecedents, so that it means opportunities which are the result of trade, commerce, and industry directly financed by an authority. In other words, even if the Project will in fact ultimately tend to provide employment opportunities, we think the relationship between appellees' means and constitutional end is too speculative and tangential, and we decline to adopt the ultra-liberal interpretation of the constititution which they urge.

For the above reasons, we conclude that appellees' attempted application of OCGA Ch. 36-42 (Code Ann. § 69-1501b et seq.) is unauthorized by Art. IX, Sec. VI, Par. III, and for that reason the agreement between the City and the Authority is unconstitutional. Therefore, the trial court erred in denying summary judgment to appellants and in granting summary judgment to appellees.

*Judgment reversed. All the Justices concur, except Clarke, Smith and Gregory, JJ., who dissent.*

DECIDED JULY 8, 1983 —
REHEARING DENIED JULY 21, 1983.

*Watson, Lawson, Joyner & Banke, Eugene E. Lawson, Allen R. Hirons,* for appellants.

*William R. McNally, R. Mark Mahler,* for appellees.

*G. Conley Ingram, Jonathon W. Lowe, Vickie Cheek Lyall,* amicus curiae.