42829, 42839, 42840, 42841, 42842. NATIONS et al. v.
DOWNTOWN DEVELOPMENT AUTHORITY OF THE CITY
OF ATLANTA et al.
(338 SE2d 240)

GREGORY, Justice.

On March 3, 1982, the Atlanta City Council adopted a resolution activating the Downtown Development Authority of the City of Atlanta (DDA), pursuant to 1976 Georgia Constitution, Art. IX, Sec. VIII, Par. II (1983 Georgia Constitution, Art. IX, Sec. VI, Par. III), and OCGA § 36-42-1 et seq., The Downtown Development Authorities Law. On January 3, 1984, the City Council adopted a resolution stating, in part, that "the Underground Atlanta area is a slum and blighted area within the meaning of OCGA § 36-61-2 (17)," and approving an Urban Redevelopment Plan (Plan) for the revitalization of the Underground area. On June 3, 1985, the City Council adopted a resolution amending the Plan, and authorizing the City to acquire all property within the Underground Atlanta Urban Redevelopment Area by any methods available at law, including eminent domain. The Plan, as amended, calls for the development of the Underground area into a "festival marketplace" of retail, dining and entertainment establishments. Additionally, a portion of the property encompassed by the Plan will be developed to include an office complex, museum, convention area, public park, pedestrian malls, terraces, streets, sidewalks, bridges and parking facilities.

The Plan further contemplates that pursuant to its authority under 1983 Georgia Constitution, Art. IX, Sec. VI, Par. IV, and OCGA § 36-42-9 et seq., the DDA will issue $85,000,000 in revenue bonds, the proceeds of which will be used in part to reimburse the City for its costs in acquiring any property needed for the project, and, in part, to finance construction of the project. Once it has acquired the necessary property, the City will lease the project property to the DDA. The DDA will sublease the commercial portions of the project to a private developer who will provide central management of the project and who will, in turn, sublease the commercial facilities to private operators. A fixed portion of the profits generated from the businesses will be paid to the developer. The developer will pay to the DDA a fixed percentage of this amount. Under § 5.3 of the lease agreement between the City and the DDA, the DDA agrees to pay as rent to the City all project revenues which will be deposited directly into the Revenue Fund, from which fund the principal and interest on the revenue bonds are to be paid. Additionally, the DDA will pay to the City $10 per annum in rent.

In August 1985, the City Council approved the Bond Resolution in conjunction with this project, authorizing the DDA to issue the aforementioned revenue bonds. The Bond Resolution includes the

lease between the City and the DDA, as well as a proposed Trust Indenture, between the DDA and the National Bank of Georgia (NBG) as trustee. The stated purpose of the Trust Indenture is to secure the revenue bonds issued by the DDA. Under the terms of the Trust Indenture, the DDA assigns all of its interest in the lease to the trustee, NBG. In a separate assignment of the lease, the City proposes to assign all its interest in the lease to the trustee.

Subsequently, the State of Georgia initiated a bond validation proceeding pursuant to the Georgia Revenue Bond Law, OCGA § 36-82-60 et seq. Appellants here were permitted to intervene in the case, and raised numerous constitutional and statutory challenges to the validation of the bonds. The trial court entered judgment which determined that all things required by the Constitution and laws of Georgia relating to the issuance of the bonds had been met, and therefore confirmed and validated the bonds and security. The judgment authorized the DDA to issue the bonds and held that, when issued, they would be a valid, binding and enforceable obligation of the DDA. Appellant in Case No. 42829 is a taxpayer. Appellants in Case Nos. 42839, 42840, 42841 and 42842 are owners of approximately forty percent of the property within the project area who have resisted the City's efforts to condemn their property.

1. OCGA § 36-82-73 et seq.,[1] require a governmental body desiring to issue revenue bonds to seek validation of the bonds in the appropriate superior court. It is the duty of the district attorney, or Attorney General in his absence, to file a petition in the name of the State against the governmental body. The petition shall set forth (1) service of the notice, (2) the name of the governmental body, (3) the amount of the bonds to be issued, (4) the purpose for which the bonds are to be issued, (5) the interest rate, (6) how much principal and interest is to be paid annually, (7) when the bonds are to be paid in full, and (8) the security to be pledged to the payment of the bonds. OCGA § 36-82-75. Any citizen of Georgia who is a resident of the issuing governmental body may become a party to the proceedings. At a duly scheduled hearing the judge shall hear and determine all questions of law and fact and render judgment confirming and validating the issuance of the bonds or refusing to do so. OCGA § 36-82-77 (a). These statutory provisions govern the scope of the superior court's inquiry in this matter and likewise limit the issues before us.

2. (a) Under the proposed lease between the City and the DDA, the City will lease the real property to the DDA. In addition to $10 per year, the DDA will pay, as rent, the project revenues which will be

---

[1] See 1983 Georgia Constitution, Art. IX, Sec. VI, Par. IV: "The General Assembly shall provide for the validation of any revenue bonds authorized and shall provide that such validation shall thereafter be incontestable and conclusive."

deposited in the Revenue Fund and ultimately paid out to the bond-holders. The proposed lease will also require the DDA to covenant to use its best efforts to issue the bonds and permit the proceeds to be used to acquire and construct the project. Further, the City will promise, under § 5.4 (b)[2] of the lease, to make up 90 percent of any shortfall which exists because project revenues are inadequate to pay the bondholders. The City will agree to include in its budget each year an amount sufficient to pay anticipated sums due under the § 5.4 (b) provision. The trial court's judgment specifically approved this provision and concluded as a matter of law that the City is authorized to levy and collect taxes for the purpose of meeting this requirement of the lease. We hold the trial court erred in this regard.

The City states in its brief that "the bond obligations are guaranteed by the City [under § 5.4 (b)], and the City has the unquestioned and unquestionable right to levy taxes to meet its guaranty obligations." The appellants point to 1983 Georgia Constitution, Art. IX, Sec. V, Par. I[3] which fixes an upper limit of debt which may be incurred by the City, and prohibits the incurring of any new debt by the City without the consent of a majority of the qualified voters. It is conceded that consent of the voters was not obtained. The City responds that the intergovenmental contracts clause of the Constitution[4] authorizes the City to contract with the DDA and that the pay-

---

[2] "In consideration of the acquisition and construction of the Project and the provision by the Lessee of the services and facilities herein provided, the City agrees that if on the third business day immediately preceding any Interest Payment Date or any other date on which any principal or interest shall be payable on the Bonds there is not on deposit in the Debt Service Account in the Sinking Fund moneys sufficient to pay the interest, or principal, premium and interest (including principal payable by reason of mandatory redemption), payable with respect to the Bonds on such date, the City shall on that day pay the amount of such deficiency to the Lessee, by causing the same to be deposited with the Trustee for the benefit of and on behalf of the Lessee, for deposit into the Debt Service Account; provided, however, that the amount required to be paid by the City under the provisions of this paragraph (b) with respect to any such date shall not exceed ninety percent (90%) of the interest, or principal, premium and interest (including principal payable by reason of mandatory redemption), payable with respect to the Bonds on such date. The City shall include within its budget each year an amount sufficient to pay any sums anticipated to be paid during such year by the City under the provisions of this paragraph (b)."

[3] 1983 Georgia Constitution, Art. IX, Sec. V, Par. I: "(a) The debt incurred by any county, municipality, or other political subdivision of this state, including debt incurred on behalf of any special district, shall never exceed 10 percent of the assessed value of all taxable property within such county, municipality, or political subdivision; and no such county, municipality, or other political subdivision shall incur any new debt without the assent of a majority of the qualified voters of such county, municipality, or political subdivision voting in an election held for that purpose as provided by law."

[4] 1983 Georgia Constitution, Art. IX, Sec. III, Par. I: "(a) The state, or any institution, department, or other agency thereof, and any county, municipality, school district, or other political subdivision of the state may contract for any period not exceeding 50 years with each other or with any other public agency, public corporation, or public authority for joint services, for the provision of services, or for the joint or separate use of facilities or equip-

ments which may be made under § 5.4 (b) are payments under an intergovernmental contract and therefore not a debt which violates the debt clause. We perceive the City's undertaking in § 5.4 (b) goes beyond the authority existing under the intergovernmental contracts clause. While that clause authorizes governmental entities to contract among themselves for time periods not exceeding 50 years, it does not authorize every type contract, but only those regarding, "joint services, for the provision of services, or for the joint or separate use of facilities or equipment" and must deal with "activities, services, or facilities which the contracting parties are authorized by law to undertake or provide." The clause does not supersede other provisions of the Constitution, such as the debt clause, which place limitations on the powers of government. It merely carves out exceptions. *Mulkey v. Quillian*, 213 Ga. 507 (100 SE2d 268) (1957). Section 5.4 (b) creates a debt of the City which is barred by the debt clause unless it constitutes an exception to the debt clause because it is a contract authorized by the intergovernmental contracts clause. We hold it is not a contract authorized by the intergovernmental contracts clause.

The intergovernmental contracts clause offers a solution to problems such as that dealt with in *Barwick v. Roberts*, 188 Ga. 655 (4 SE2d 664) (1939). There this Court held the obligation the State Department of Agriculture undertook to pay to an individual as rent for the use of real estate under a lease, which was to extend over a period of years, was a debt and in violation of the debt clause. Had the intergovernmental contracts clause as it now exists been a part of the Constitution at the time (it was adopted in 1941 as an amendment to the 1877 Constitution, Ga. Laws 1941, p. 50) the Department could have leased similar facilities from a governmental entity for a period not to exceed 50 years and thereby provided the facilities it sought to provide under the program in question. Thus the intergovernmental contracts clause would have provided an exception to the debt clause. But here the City's promise to use its taxing power to pay up to 90 % of any shortfall due the bondholders should the project proceeds prove to be insufficient is not a contract for services or joint services, nor is it a contract for the joint or separate use of facilities or equipment. The City, which is the lessor of the land in question, will receive rent from the DDA for the land and for the facilities which the DDA will have constructed from bond proceeds. The City will pass the rent on for the ultimate benefit of the bondholders. In addition, the City will "guarantee" the bond obligations under § 5.4

---

ment; but such contracts must deal with activities, services, or facilities which the contracting parties are authorized by law to undertake or provide."

(b). This latter obligation is a debt which does not come within the exceptions created by the intergovernmental contracts clause and is therefore barred by the debt clause.

In *Building Auth. of Fulton County v. State of Ga.*, 253 Ga. 242 (321 SE2d 97) (1984), two bond issues were validated. In the retardation center bond issue Fulton County contracted with the authority for the use of *facilities*, one of the three elements in the first requirement of the intergovernmental contracts clause (services, *facilities* or equipment). The *facilities* were to be used by the county to engage in the *activity* of operating a retardation center for the benefit of its citizens, two of the three elements in the second requirement of the intergovernmental contracts clause (*activities*, services or *facilities*). No one questioned that the activity and facilities were ones the county was authorized by law to undertake or provide. In the government center bond issue the county contracted with the authority for services including the preparation of plans for the development of the center. Thus both requirements of the intergovernmental contracts clause were met in that the contract was for services to construct a facility. No one questioned that the services and facilities were ones which the contracting parties were authorized by law to undertake or provide.

Here the City is the lessor of land upon which its lessee, the DDA, will construct facilities. The lessee will pay rent to the city which will ultimately be paid over to the bondholders to repay the funds borrowed by the lessee to construct the facilities. Furthermore, the City under § 5.4 (b) will guarantee 90% of the debt to the bondholders should the rent be inadequate because the facilities fail to produce the expected revenue. The guarantee of the City is not a contract for services (either for the issuance of the bonds or for any other service), facilities or equipment which falls within the first requirement of the intergovernmental contracts clause. Neither is the guarantee an activity, service or facility which the City is authorized by law to undertake or provide. Hence it fails to meet the second requirement of that clause. Rather, the guarantee is a loan of the credit of the City for the benefit of the developers and in violation of 1983 Georgia Constitution, Art. IX, Sec. II, Par. VIII. (See footnote 5.)

Our holding in this opinion in no way alters our previous decisions upholding typical authority financing such as that described in *Building Auth. of Fulton County*, supra, and *Frazer v. City of Albany*, 245 Ga. 399 (265 SE2d 581) (1980).

(b) Appellants contend § 5.4 (b) violates 1983 Georgia Constitution, Art. IX, Sec. VI, Par. I, and OCGA § 36-42-9 (a). Article IX, Sec. VI, Par. I permits counties, cities and other political subdivisions to issue revenue bonds but limits payment of the bond obligations to the proceeds of the project and specifically precludes the exercise of the

taxing power to pay principal or interest of the bonds. OCGA § 36-42-9 (a) provides that revenue bonds issued by an authority shall be paid solely from the property in question. Because our decision in Division 2 (a) above invalidates the § 5.4 (b) covenant it is not necessary for us to reach these issues.

(c) Appellants contend the assignment of the lease by the City for the ultimate benefit of the bondholders violates 1983 Georgia Constitution, Art. IX, Sec. II, Par. VIII,[5] in the same manner this court found an unlawful donation or gratuity in *Rich v. State of Ga.*, 237 Ga. 291 (227 SE2d 761) (1976). The argument points out that the City contends § 5.4 (b) is not a debt of the City. If this is the case, states the argument, then the assignment of that covenant is without consideration and a mere gratuity to the bondholders. We have held the § 5.4 (b) covenant invalid on other grounds. This leaves the funds ultimately available to the bondholders limited to the project property, as authorized by OCGA § 36-42-9 (a). Therefore, there is no violation of 1983 Georgia Constitution, Art. IX, Sec. II, Par. VIII.

(d) Appellants argue 1983 Georgia Constitution, Art. IX, Sec. II, Par. VII (a),[6] while authorizing the sale of property earlier acquired through eminent domain to private enterprise for private use, does not authorize the initial acquisition of private property through eminent domain for the purpose of selling to private individuals. The argument is that the 1983 Constitution places Georgia in the position existing in 1953 and discussed in *Housing Auth. v. Johnson*, 209 Ga. 560, 563 (74 SE2d 891) (1953). That is, while private property acquired by eminent domain and put to a public use may be sold to private parties after it has served its public use, it may not be acquired for the purpose of selling it to private persons. We do not agree. We find the meaning of 1983 Georgia Constitution, Art. IX, Sec. II, Par. VII (a) to be the same in this regard as was present in the 1954 amendment to the 1945 Georgia Constitution discussed in *Bailey v. Housing Auth.*, 214 Ga. 790 (107 SE2d 812) (1959). The authority ". . . to undertake and carry out community redevelopment . . ." includes the power to acquire by eminent domain the redevelopment property which may later be sold to "private enterprise for private uses."

(e) OCGA § 22-1-3 provides: "It is the province of the General Assembly to determine when the right of eminent domain may be ex-

---

[5] "The General Assembly shall not authorize any county, municipality, or other political subdivision of this state, through taxation, contribution, or otherwise, to appropriate money for or to lend its credit to any person or to any nonpublic corporation or association except for purely charitable purposes."

[6] "The General Assembly may authorize any county, municipality, or housing authority to undertake and carry out community redevelopment, which may include the sale or other disposition of property acquired by eminent domain to private enterprise for private uses."

ercised. If, however, under pretext of such necessity the General Assembly should pass a law authorizing the taking of property for private use rather than for public use, the courts should declare the law inoperative." The appellants contend we should declare the entire project inoperative as being in conflict with the statute. We decline to do so. The taking is for the public purpose of redevelopment and not in violation of OCGA § 22-1-3. *Bailey v. Housing Auth.*, supra at 793. The authority to sell to private enterprise for private use stems from the Constitution. 1983 Georgia Constitution, Art. IX, Sec. II, Par. VII (a).

3. (a) Relying on *Hicks v. State of Ga.*, 99 Ga. App. 302 (108 SE2d 187) (1959), appellants argue that the trial court erred in validating the bonds because they are not "economically feasible."

In *Hicks*, the trial court validated certain revenue-anticipation certificates issued by the City of Lavonia, the revenues of which were to be used to purchase a gas distribution system from the City of Toccoa. The City of Toccoa had constructed this system from the proceeds of revenue-anticipation certificates previously validated and issued. As part of the municipal ordinance approving the revenue certificate resolution, the City of Toccoa covenanted that so long as any of the certificates were outstanding, it would not sell or otherwise dispose of the gas distribution system. At the time the City of Lavonia sought to have its revenue-anticipation certificates validated, a majority of the Toccoa certificates were outstanding. Finding that the City of Toccoa's covenant not to sell while there were certificates outstanding was valid, the Court of Appeals determined that the City of Lavonia could not purchase the gas distribution system and, as a matter of law, could not carry out the purpose for which it sought to issue the certificates. Therefore, it held that the trial court erred in validating the certificates. In doing so, the Court of Appeals noted that the project was "unfeasible and economically unsound." 99 Ga. App. at 307.

Appellants ask us to interpret *Hicks* to impose a duty on the trial court to examine the "economic feasibility" of a project sought to be financed by revenue bonds before it validates the bonds. Appellants suggest that the scope of the inquiry would be to determine whether the project will succeed or fail in the marketplace. *Hicks* does not require that such a determination be made. The opinion rests upon the determination that the project was not legally possible since Toccoa could not sell its system. The trial court did not weigh the economic pros and cons of the proposed project. We also note that "[t]he. economic feasibility of the plan is not required to be shown by the state in its petition." *Rich v. State of Ga.*, supra at 295 n. 2.

(b) Appellants maintain that it has not been shown that the City has the capacity to acquire all the property needed for the Under-

ground project, and therefore there is no indication that the purpose for which these bonds are issued will be carried out.

Under OCGA § 36-61-9 (c) of the Urban Redevelopment Law, the City has the power to condemn the project property owned by appellants "for the purpose of devoting it to a public use." If, as appellants maintain, their property will be converted to a private use under the Plan, the City must afford the appellants the opportunity to develop their property themselves in accordance with the Plan. OCGA § 36-61-9 (c). In either event, the project will proceed. The *validation* of the issuance of the bonds for this project is not affected by the fact that acquisition of project property is an issue currently being litigated.

If the City proposed a project which required acquisition of property beyond its power to acquire, we would have a different question whether issuance of the bonds should be validated. But the project proposed by the City in this case requires that the City either acquire ownership or involve the present owners of the property in the project through their rights under OCGA § 36-61-9 (c). This project will proceed either by acquisition of property by the City or by participation of the current owners. The specific manner in which the project proceeds is an issue to be decided in the condemnation actions. Appellants will have the opportunity to litigate whether they have been deprived of any rights under OCGA § 36-61-9 (c) in that forum.

Therefore, the trial court correctly held that the appellants' rights under OCGA § 36-61-9 (c) are not at issue in the validation proceeding. Further, the trial court did not err in refusing to continue the bond validation proceedings in order that appellants might have discovery on this issue.

4. Appellants argue that the plan is an attempt to use the Downtown Development Authority of the City of Atlanta to finance public improvements in violation of *Odom v. Union City Downtown Dev. Auth.*, 251 Ga. 248 (305 SE2d 110) (1983). We do not agree.

In *Odom*, the DDA sought to issue revenue bonds, the proceeds of which would finance the construction of a new city hall, renovate the existing police station and jail, and improve city streets. The project thus consisted of purely public elements. This court held that the scope of this project did not fall within the constitutionally designated purposes of Downtown Development Authorities which are the promotion and development of "trade, commerce, industry, and employment opportunities." 1983 Georgia Constitution, Art. IX, Sec. VI, Par. III.

In the case before us the project is comprised of both public and private components which are integrated so as to produce the desired purposes. The trial court found that the project will promote and develop the public purposes of trade, commerce, industry, and employ-

ment opportunities. There is evidence in the record to support this determination.

5. As noted earlier, the City relies upon the intergovernmental contracts clause, 1983 Georgia Constitution, Art. IX, Sec. III, Par. I, for authority to enter the lease agreement. But, as appellants point out, the lease allows for an initial period of 50 years plus an option provided in § 5.1 to extend the duration of the lease for an additional 25 years. This is the equivalent of a 75-year contract, *Parker v. Gortatowsky*, 127 Ga. 560 (56 SE 846) (1906); *Ask Enterprises, Inc. v. Johnson Model Bedding, Inc.*, 155 Ga. App. 294 (270 SE2d 709) (1980), and therefore exceeds the authority given in the Constitution.

6. We hold the trial court erred in failing to require the limiting of § 5.1 to 50 years and the elimination of § 5.4 (b) from the lease and their effects upon other portions of the Plan. In other regards the trial court's order validating the issuance of the bonds is affirmed. Since the 25-year option of § 5.1 and § 5.4 (b) are severable from the Plan and the lease they may be removed and the issuance of the bonds validated.

*Judgment affirmed on the condition that lease § 5.1 is limited to 50 years and 5.4 (b) is eliminated, otherwise reversed. Hill, C. J., Marshall, P. J., Smith and Bell, JJ., and Judge Dorothy A. Robinson, concur. Clarke, J., dissents as to Division 2. Weltner, J., disqualified.*

HILL, Chief Justice, concurring.

I write separately because the City of Atlanta and others urge that this financing plan is no different from those plans approved in the line of cases in which *Building Auth. of Fulton County v. State of Ga.*, 253 Ga. 242 (321 SE2d 97) (1984), is the most recent.[1]

The typical authority financing plan, exemplified by the *Building Auth. of Fulton County* case, is as follows:

A. The authority owns the property. It issues revenue bonds and uses the proceeds of the bonds to construct the project.

B. The state, county, city or private industry leases the property from the authority for a period of years, and agrees to pay rent annually to the authority in amounts necessary to retire the revenue bonds issued by the authority.

The financing plan presently before us is different in the following particulars:

A. The city owns, or will acquire and own, the property. The authority proposes to issue revenue bonds, the proceeds of which are to finance construction of the project and repay the city for part of its

---

[1] For the beginning of this line of cases, see *Sheffield v. State School Building Auth.*, 208 Ga. 575 (68 SE2d 590) (1952).

acquisition costs.

B. The authority leases the property from the city and subleases its commercial portions to a private developer; the developer subleases to subtenants who will occupy the property. The subtenants pay the developer which in turn pays the authority. The rent received by the authority from the developer will be paid to the city. The city has assigned its interest in its lease with the authority to the trustee to retire the revenue bonds issued by the authority.

C. The city (in section 5.4 (b) of its lease to the authority) promises to pay the authority, by deposit with the trustee for the authority's benefit, up to 90% of any shortfall which exists because payments by the private developer to the authority are inadequate to pay the bondholders.[2]

That is to say, the city — the owner of the property, the landlord — agrees to pay its tenant, the authority, if the authority's rental payments to the city are inadequate to pay the bondholders.[3] No case has been cited by the parties and we have found none in which this court has approved an authority financing plan in which the city, or county, or state, as landlord or tenant, has agreed to guarantee that a private developer's rental payments to an authority will be sufficient to pay the bondholders. Compare *Sigman v. Brunswick Port Auth.*, 214 Ga. 332 (1) (104 SE2d 467) (1958). This financing plan is different from the typical authority financing plan which this court approves. The real question is whether this difference renders this plan invalid.

In the typical authority financing plan, the tenant's rental payments are sufficient to retire the bonds; the tenant may be a city paying rent. Here the city is not paying rent; it has agreed to guarantee the private developer's rental payments to the authority. This the city cannot do. See *State Ports Auth. v. Arnall*, 201 Ga. 713 (1) (41 SE2d 246) (1947); *Sigman v. Brunswick Port Auth.*, supra; *Rich v. State of Ga.*, 237 Ga. 291, 300-302 (227 SE2d 761) (1976). Although the intergovernmental contracts clause of the Constitution, Art. IX, Sec. III, Par. I, authorizes a city to contract with an authority, "such contracts must deal with activities, services, or facilities which the contracting parties are authorized by law to undertake or provide,"[4] and the Constitution also provides that the General Assembly shall not authorize any municipality "through taxation, contribution, or otherwise, to ap-

[2] In addition, the city agrees to include in its budget each year an amount sufficient to pay any sums anticipated to be paid during such year pursuant to section 5.4 (b).

[3] Landlords collect rent; they do not normally guarantee their tenants' ability to pay rent.

[4] Insofar as *Building Auth. of Fulton County*, supra, involved the "Government Center Undertaking," Fulton County was authorized to perform those activities and services for itself and hence could contract with the authority to do so. The Fulton County contract contained no provision similar to section 5.4 (b) in issue here.

propriate money for or to lend its credit to any person or to any non-public corporation or association except for purely charitable purposes." Art. IX, Sec. II, Par. VIII.[5] Hence, the city cannot appropriate money for or lend its credit to a private developer.[6]

The following statement from the Encyclopedia of Georgia Law, 3 EGL, Authority Financing, § 25, p. 50 (1975), is well established: ". . . [O]ur courts, in deciding authority questions, draw a sharp distinction between, on the one hand, a 'debt,' that is to say, a provision requiring the state or its subdivisions to subsidize an authority with cash, as is prohibited under the State Ports Authority case [supra], and, on the other hand, a right to contract with the authority for its services, which may be done, even though the state is thereby obligated to undertake the future expenditure of funds. Under these holdings, the state [or a city] may become indebted to the authority for goods and services, but it cannot become indebted to the bondholders of the authority or to the general public for any default of the authority." (Matter in brackets added.)

For the foregoing reasons, I concur in the majority opinion.

I am authorized to state that Presiding Justice Marshall joins in this concurrence.

CLARKE, Justice, dissenting as to Division 2.

While I concur in the affirmance of validation and the elimination of § 5.1 from the lease, I respectfully dissent to the holding in Division 2 that § 5.4 (b) of the lease must also be eliminated. I recognize the Constitution prohibits long term debts by governmental entities. It is my understanding that this is part of the philosophy which had its origin with the admirable fiscal conservatism of Robert Toombs, who upon completion of his work on the Georgia Constitution of 1877, said, "I have locked the door of the treasury and thrown the key away." It appears to me, however, that the majority overlooks the subsequent course of legislative actions and judicial holdings which have circumvented the rigidity of General Toombs' philosophy, mainly through the means of authority financing.

---

[5] It may be that there is not much monetary difference between a city's agreement to pay rent for a period of years and a city's agreement to guarantee that an authority will pay rent. Nevertheless, it is a difference recognized by our Constitution and therefore one which we are not at liberty to ignore.

[6] It might be argued that the city is lending its credit to the authority, not to the private developer. Such an argument would be full of holes, holes big enough for city funds to run through. Unlike a private business, the city is not authorized to insure the authority's bonds. Moreover, OCGA § 36-42-12 provides that no holder of downtown development authority bonds "shall ever have the right to compel any exercise of the taxing power of the state or any county, municipal corporation, or political subdivision thereof, nor to enforce the payment thereof against the state or any such county, municipal corporation, or political subdivision."

The most recent of these holdings appears in *Building Auth. of Fulton County v. State of Ga.*, 253 Ga. 242 (321 SE2d 97) (1984). I am unable to distinguish the obligations incurred by Fulton County in that case from the obligations incurred by the City of Atlanta in the case before us. In *Building Auth. of Fulton County*, we approved bonds to be issued by the Building Authority for the construction of a retardation center. The lease contract between the Authority and county imposed an obligation upon the county to pay rent and it was these rental payments which would be used to service the debt created by the bonds. The Authority itself had no other means of retiring the debt. It therefore seems clear to me that the bonds were rendered marketable only because of the agreement of the county to make the rental payments. To say that this did not amount to the creation of a long term obligation or debt by the county to the bondholders applies form over substance. In each of these cases, there is a lease contract. In each of these cases, certain obligations are undertaken by the Authority and in each of these cases, the governing authority agrees to something in return. Fulton County agreed to pay money in the form of rent. The City agreed to pay money only upon the occurrence of a contingency. I fail to understand how an obligation which must be paid is not a debt and an obligation which may never have to be paid is a debt.

It matters not that the money in the *Building Authority* case went through the hands of the Authority before reaching the hands of the bondholders. The fact of the matter is an authority never really handles the money in either event since both of these plans would require that the payments be made to a trustee.

We may long for the days of General Toombs. I cannot now say that he was wrong, but I cannot bring myself to understand how Fulton County can agree to make payments to the Building Authority and thereby render its bonds marketable while the City of Atlanta cannot as part of a lease agreement agree to make payments upon the occurrence of a contingency which may or may not transpire. There are indeed subtle distinctions between the methods used by the Building Authority and those contemplated by the Downtown Development Authority. One is a goose and the other is a gander and the sauce for either of them ought to be the same.

DECIDED DECEMBER 11, 1985 —
RECONSIDERATION DENIED JANUARY 8, 1986.

*Mayer, Nations & Perkerson, Randolph A. Mayer, Troutman, Sanders, Lockerman & Ashmore, J. Kirk Quillian, Donald W. Janney, G. Craig Birchette, Hicks, Maloof & Campbell, Bruce M. Eden-*

field, Sutherland, Asbill & Brennan, John W. Bonds, Jr., Richard L. Robbins, Arnold, Golden & Gregory, Richard N. Hubert, Ennis, Friedman, Bersoff & Ewing, Paul R. Friedman, David W. Ogden, for appellants.

Kutak, Rock & Campbell, Felker W. Ward, Jr., Jo Lanier Meeks, Long & Aldridge, Clay C. Long, R. William Ide III, Kilpatrick & Cody, A. Stephens Clay, Mara McRae, Marva Jones Brooks, Rogers & Hardin, Steven E. Fox, for appellees.

Heard, Leverett & Adams, L. Clifford Adams, Jr., amicus curiae.