S99A1141, S99A1142, S99A1281. HANEY et al. v. DEVELOPMENT AUTHORITY OF BREMEN et al. (three cases).
(519 SE2d 665)

FLETCHER, Presiding Justice.

The Development Authority of Bremen sought to issue $7.2 million in revenue bonds to finance a public golf course in an industrial park in the City of Bremen. Two hundred sixty-five city residents intervened to oppose the bonds and project. The trial court validated the bonds and related documents and ordered the intervenors to post a $3 million surety bond to cover all damages and costs that the city and authority might incur during the appeal. Because the trial court abused its discretion in requiring a bond and the proposed project does not promote trade, commerce, or industry, we reverse the judgment confirming and validating the issuance of the revenue bonds.

In 1979, the authority purchased 400 acres of land for an industrial park. It financed the purchase by issuing purchase money notes to the sellers, which must be paid by December 31, 1999. After environmental regulations made the land unsuitable for industrial development, the authority last year proposed constructing a golf course to generate revenue to pay off the notes.

In November 1998, a petition was filed in superior court for the validation of revenue bonds to finance the Turkey Creek Golf Course Project. The project includes an 18-hole public golf course, club house, pro shop, maintenance building, practice putting greens, and driving range. The authority will use the bond proceeds to pay the debt on its 1979 notes, the design and construction costs of the golf course, and the costs of issuing the bonds. The authority and city intend to hire a private management company that will employ 25 people to operate the golf course once it is constructed. If the project's operating revenues are insufficient to pay for the expenses of operating the golf course and the debt service on the bonds, the city is obligated to pay both.

After the trial court entered its order validating the proposed bonds and contracts, the intervenors announced their intention to appeal and the authority and city filed a petition requesting that the intervenors post a bond under the Public Lawsuits Act.[1] The trial court found that the appeal will delay the issuance of the bonds and prevent the authority from completing the golf course and retiring the notes due on December 31, 1999. Without explaining the basis for its figure, it ordered the intervenors to post a $3 million surety bond to cover increased costs, lost revenues, and potential losses during the appeal. The intervenors did not post the surety bond, and their appeal was dismissed by operation of law under OCGA § 50-15-2.

In S99A1141, the intervenors appeal from the validation judgment, challenging the authority's power to finance and construct a golf course and the means and method used to finance and operate the project. In S99A1142, they appeal from the order requiring the surety bond.

## S99A1142, S99A1281. BONDS IN PUBLIC LAWSUITS

1. The Public Lawsuits Act gives courts the authority to require a bond of any party who opposes a public improvement project in a public lawsuit. The purpose of the act is to protect the public from increased financial costs caused by the filing of non-meritorious or frivolous litigation against the project.[2]

---

[1] OCGA §§ 50-15-1 to 50-15-4 (1998).
[2] See 1969 Ga. Laws 815, 816.

Although enacted 30 years ago, the act has never been interpreted by an appellate court. As codified, the act permits any political subdivision in a public lawsuit to petition for a court order that the opposing party or intervenors be dismissed unless they post a bond.[3] OCGA § 50-15-1 defines a "political subdivision" as any state or local body with the right to sue or issue bonds. A "public lawsuit" is defined as any action that questions or opposes "the construction, improvement, financing, or leasing of any public improvement, project, or facility by any political subdivision . . . including, but not limited to, actions for declaratory judgments or injunctions or interventions."

The bond requirement is not limited to appeals, but may be imposed by the trial court whenever it determines that a bond would be in the public's interest.

> If, at the hearing of the petition on the order to show cause, the court determines that it is in the public interest to do so, the court shall set the amount of bond to be filed by the opposing party or parties or intervenors in an amount found by the court to cover all damage and costs which may accrue to the political subdivision by reason of the opposition or intervention in the event the political subdivision prevails.[4]

If no bond is filed within ten days of an order, the opposing party or intervenor shall be dismissed by operation of law, but may appeal the order. The appellate courts have the authority to stay the lower court order, set the bond to be filed, modify the lower court order, or enter a final order. OCGA § 50-15-3 directs both trial and appellate courts to give expeditious consideration to public lawsuits, and § 50-15-4 prohibits the filing of other actions related to the same subject matter after a public lawsuit is commenced.

Given the broad statutory definitions of the terms "political subdivision" and "public lawsuit," we conclude that the provisions of the Public Lawsuits Act apply to proceedings under the Revenue Bond Law.[5] The development authority and city are political subdivisions with the right to bring and defend actions or to issue bonds or other obligations as evidence of indebtedness; the bond validation proceeding is an action in which city residents have intervened to prevent the construction and financing of a public improvement project.

2. On appeal, we must determine whether the trial court abused its discretion in requiring the intervenors to post a $3 million surety

---

[3] See OCGA § 50-15-2.
[4] Id.
[5] See OCGA §§ 36-82-60 to 36-82-85 (1993).

bond.[6] The issue is whether the trial court correctly concluded that it was in the "public interest" to require a surety bond in this validation proceeding.[7]

In construing this term, we must consider the legislative intent in passing the Public Lawsuits Act.[8] The bill was enacted "to protect the public from financial damages due to non-meritorious or frivolous litigation."[9] Thus, while any lawsuit filed against a public project may increase its costs, the act makes clear that the legislature intended to discourage frivolous or non-meritorious challenges because their harm to the public purse offsets any benefit. Here, the intervenors have raised meritorious claims concerning whether the proposed contracts meet the constitutional requirements for intergovernmental contracts that are not subject to the constitutional debt clause and whether the proposed golf course is a project that promotes the development of trade, commerce, industry, and employment opportunities as required under the constitution and statute. Therefore, we hold that the trial court abused its discretion in requiring the intervenors to post a surety bond in this proceeding.

## S99A1141. VALIDATION OF THE REVENUE BONDS

3. The Georgia Constitution permits the creation of development authorities.[10] "The development of trade, commerce, industry, and employment opportunities being a public purpose vital to the welfare of the people of this state, the General Assembly may . . . authorize the creation of [a development] authority by any county or municipality."[11] The constitution further permits the legislature to exempt an authority's property and income from taxation and to allow authorities to issue revenue bonds without the bonds constituting a state "debt." Based on this constitutional provision, the General Assembly enacted the Development Authorities Law.[12] The law states that its purpose is to promote trade, commerce, industry, and employment opportunities for the public good and the general welfare.[13] Towards

---

[6] See *Ebon Foundation v. Oatman*, 269 Ga. 340 (498 SE2d 728) (1998); *Hardin v. State*, 251 Ga. 533 (307 SE2d 669) (1983); *Reid v. Reid*, 246 Ga. 592 (272 SE2d 685) (1980).

[7] Because we reverse the surety bond order based on our interpretation of the "public interest," we need not address whether the trial court erred in setting the bond at three million dollars based on the authority's evidence of damages and costs.

[8] See OCGA § 1-3-1.

[9] 1969 Ga. Laws 815, 816.

[10] See Ga. Const. art. IX, sec. VI, para. III.

[11] Id.

[12] See OCGA §§ 36-62-1 to 36-62-13 (1993); see also *Odom v. Union City Downtown Dev. Auth.*, 251 Ga. 248, 252 (305 SE2d 110) (1983) (Development Authorities Law enacted to implement Article IX, Section VI, Paragraph III).

[13] See OCGA § 36-62-9.

this end, an authority may borrow money and issue revenue bonds to purchase land for an industrial park or purchase, acquire, or construct a project.[14]

The question here is whether the proposed public golf course meets the statutory definition of projects in OCGA § 36-62-2 (6). There are two paragraphs on which the trial court relied in concluding that the project promoted trade, commerce, and industry. Paragraph (H) (i) defines "project" to include "sports facilities, including private training and related office and other facilities when authorized by the governing authority of the political subdivision or municipal corporation in which the facility is to be constructed and maintained." Paragraph (N), the final catch-all provision in the definition of projects, provides that a project may be for "any industrial, commercial, business, office, parking, public, or other use" where the authority resolves that the project furthers "the essential public purpose of the development of trade, commerce, industry, and employment opportunities."

Construing the act's list of projects, we conclude that the proposed golf course is not a "sports facility" permitted under paragraph (H).[15] Besides sports facilities, that paragraph lists convention and trade show facilities and hotel and motel facilities that are constructed in connection with convention, sports, or trade show facilities.[16] As used in the statute, the term "sports facilities" refers to a stadium, coliseum, arena, or similar structure used for professional and competitive sporting events and other large-scale entertainment events. It does not mean a youth ballpark, tennis complex, swimming pool, or golf course that is designed primarily to provide recreational opportunities for local residents and taxpayers.[17]

Whether the proposed golf course comes within the constitution's paragraph on development authorities or the law's paragraph (N) is a closer question. Relying on legislative history, we have previously concluded that the constitutional provision does not provide authority to finance all commerce and trade in this state or every project

---

[14] See OCGA § 36-62-6.

[15] Cf. *Day v. Development Authority*, 248 Ga. 488, 489-490 (284 SE2d 275) (1981) (holding that act's definition of projects did not include retail grocery stores, other retail stores, fast food restaurants and similar endeavors).

[16] Cf. S.C. Code Ann. § 4-29-10 (3) & (8) (1976) (defining project to include "any enterprise engaged in commercial business, including . . . tourism, sports and recreational facilities" which mean "property used . . . in connection with theme parks, amusement parks, historical, educational or trade museums, cultural centers, or spectator or participatory sports facilities, generally available to the public, including . . . marinas, beaches, bathing facilities, golf courses, theaters, arenas, and auditoriums"), quoted in *Hucks v. Riley*, 354 SE2d 913 (S.C. 1987).

[17] See OCGA § 36-82-61 (giving municipal corporations the authority to issue revenue bonds for the purpose of acquiring or constructing "golf links and fairways").

that serves a public use.[18] In *Odom v. Union City Downtown Development Authority*,[19] we held that a proposed project to improve streets, construct a city hall, and renovate the existing city hall was designed to fulfill governmental functions and thus did not fit within the definitions of commerce, trade, or industry.[20] Although the authority argued in that case that the project was permissible because it would provide employment opportunities during its construction and operation, we interpreted the general term "employment opportunities" to mean opportunities resulting directly from the trade, commerce, or industry that the authority financed.

Similarly, the Development Authority of Bremen's proposal to construct an 18-hole public golf course is designed to fulfill the governmental function of providing recreational facilities and services to area residents.[21] Despite charging admission fees in an attempt to cover its operating expenses and debt service, the project is not a traditional business enterprise conducted for profit and thus does not meet the definition of a trade, industry, or commerce. The trial court's conclusions that "golf" is an "industry" and "sports facilities are the engines which drive the economy" of some communities do not transform this particular proposal for a mid-priced public golf course to serve the local community into a commercial project that will stimulate the Bremen area economy. Nor does the fact that the privately-managed facility is located in an industrial park and projected to employ 25 people create employment opportunities in a trade or industry as contemplated by the statute.[22]

Therefore, we hold that the Turkey Creek Golf Course Project violates both the Georgia Constitution and the Development Authority Law because it is neither a sports facility nor for the public purpose of developing trade, commerce, and industry. Because of this holding, we need not decide the intervenors' other contentions related to the intergovernmental contracts.

*Judgment reversed. All the Justices concur, except Carley, J., who dissents.*

---

[18] See *Day*, 248 Ga. at 490; *Georgia State Financing v. State of Georgia*, 253 Ga. 766 (325 SE2d 162) (1985).

[19] 251 Ga. 248.

[20] See id. at 254 (defining commerce and trade as "practically every business occupation carried on for subsistence or profit" and "industry" as "any department or branch of art, occupation, or business conducted as a means of livelihood or for profit.").

[21] See OCGA § 36-34-3 (1993) (giving municipal corporations the power to acquire, construct, or operate parks, golf courses, and recreation grounds); see also §§ 36-64-1 to 36-64-14 (1993) (permitting cities and counties to develop, maintain, and operate parks, playgrounds, recreation centers, and other recreational facilities).

[22] See *Odom*, 251 Ga. at 255 (finding relationship between project and employment opportunities too speculative and tangential when jobs were not the result of the trade or industry financed directly by the authority).

CARLEY, Justice, dissenting.

I dissent to the majority's reversal of the judgment of the trial court because I do not believe that the trial court abused its discretion in ordering appellants to post a surety bond, as provided by OCGA § 50-15-2. An affirmance of the judgment requiring the bond would result in a dismissal of the appeal since appellants did not post the bond set by the trial court. Therefore, I will not address the merits of the appeal which has been dismissed by operation of law.

Under the majority's analysis, the Public Lawsuits Act (PLA) prohibits the trial court from requiring a surety bond unless the litigation is clearly frivolous or non-meritorious. Even if this construction of OCGA § 50-15-2 would be reasonable at the outset of the lawsuit, it should not apply where the trial court has rendered its decision on the merits of the underlying litigation. If there is an appeal of the trial court's final judgment in favor of the political subdivision and the political subdivision so moves, the trial court must then determine whether it is "in the public interest" to require a supersedeas bond during the appeal. Contrary to the majority's conclusion, I do not believe that a trial court abuses its discretion in granting an appeal bond under the PLA simply because some of the claims asserted appear meritorious. Once a trial court has ruled on the merits of the case, it is anomalous to prohibit the trial court from requiring an appeal bond because an appellate court may later rule differently. The statute provides that if, after hearing, the trial court determines that the posting of a supersedeas bond "is in the public interest," it "*shall* set the amount of the bond . . . to cover all damage and costs which may accrue to the political subdivision by reason of the . . . intervention in the event the political subdivision prevails." (Emphasis supplied.) OCGA § 50-15-2.

In this case, the trial court has already examined and rejected the claims of appellants. Therefore, the trial court must have considered the claims to lack merit. The fact that an appellate court may later find merit where the trial court has found none does not mean that the trial court abused its discretion in requiring an appeal bond. I believe that the majority today effectively holds that a trial court *always* abuses its discretion when it requires an appeal bond in a public lawsuit which is not clearly frivolous. Thus, in the absence of further legislation, the appellate courts of Georgia will hereafter be required to second-guess each and every order of a trial court requiring an unsuccessful litigant to post an appeal bond pursuant to OCGA § 50-15-2. Because I believe that such an approach is an unreasonable interpretation of the statute, I dissent to the reversal of the trial court's order requiring appellants to post a surety bond during the pendency of the appeal.

410

DECIDED JULY 8, 1999 —
RECONSIDERATION DENIED JULY 30, 1999.

*Mullins & Whalen, Andrew J. Whalen III, Jacob A. Maurer,* for appellants.

*James R. Osborne, District Attorney, Tallapoosa Circuit, Jack F. Witcher, Chamberlain, Hrdlicka, White & Williams, Richard N. Hubert, Daniel M. McRae, Griffith F. Pitcher,* for appellees.