WILLIAM F. MAREADY, Plaintiff v. THE CITY OF WINSTON-SALEM; THE BOARD OF ALDERMEN OF THE CITY OF WINSTON-SALEM; FORSYTH COUNTY; THE BOARD OF COUNTY COMMISSIONERS OF FORSYTH COUNTY; AND WINSTON-SALEM BUSINESS, INC., Defendants, and STATE OF NORTH CAROLINA *EX REL.* MICHAEL F. EASLEY, ATTORNEY GENERAL, Defendant-Intervenor

No. 422PA95

(Filed 8 March 1996)

**1. Taxation § 4 (NCI4th)— economic development incentive grants—public purpose**

The statute which authorizes local governments to expend public moneys for economic development incentive grants to pri-

vate corporations, N.C.G.S. § 158-7.1, does not violate the public purpose clause of the North Carolina Constitution since the purpose of the statute is to increase the population, taxable property, agricultural industries and business prospects of a city or county; the activities authorized by § 158-7.1 are in keeping with those accepted as within the scope of permissible governmental action and invoke traditional governmental powers and authorities in the service of economic development; and the public advantages of the statute are not indirect, remote, or incidental but are directly aimed at furthering the general economic welfare of the people of the affected communities. N.C. Const. art. V, § 2(1).

**Am Jur 2d, State and Local Taxation §§ 42 et seq.**

2. **Constitutional Law §§ 37, 38 (NCI4th)— economic development incentive grants—authority given to cities and counties—statute not unconstitutionally vague**

The statute which authorizes local governments to make economic development incentive grants to private corporations, N.C.G.S. § 158-7.1, is not unconstitutional as impermissibly vague, ambiguous, and without reasonably objective standards since restrictions with respect to the delegation of power to an agency of the State do not apply to cities and counties; cities and counties have authority to exercise broad discretion within statutory limits; the General Assembly could constitutionally give local governments considerable flexibility and discretion to execute the perceived public purpose of economic development in communities within their jurisdictions; and the meaning and intent of § 158-7.1 are sufficiently clear to pass constitutional muster.

**Am Jur 2d, Constitutional Law §§ 332, 350, 351.**

3. **Municipal Corporations § 157 (NCI4th); State § 9 (NCI4th)— economic development incentive grants— closed meetings—no violation of Open Meetings Law**

The Winston-Salem Board of Aldermen and the Forsyth County Board of Commissioners did not violate the Open Meetings Law by meeting in closed sessions to discuss the amount of economic development incentives to offer private corporations pursuant to N.C.G.S. § 158-7.1 and by reaching a group decision in private since N.C.G.S. § 143-318.11(a)(4) allows closed meetings for economic development discussions; each closed session held to discuss economic development expendi-

tures was preceded by a motion and approving vote at an open public meeting to go into closed session for the discussion of matters relating to the location or expansion of business or industry; no action was taken during the closed sessions which would authorize any city or county official to sign a contract or to make any expenditures of funds; and all actions authorizing or approving the signing of an economic development contract or commitment and the payment of economic development expenditures were taken in regularly scheduled public meetings. Because the Open Meetings Law authorizes a closed session to discuss the acquisition of an interest in real property and N.C.G.S. § 158-7.1(c) requires that the notice of the public hearing thereon describe the intention to approve it, it follows that the intent to approve the acquisition which is the subject of the notice may be formed in a closed session.

**Am Jur 2d, Municipal Corporations, Counties, and Other Political Subdivisions §§ 155 et seq.**

**Validity, construction, and application of statutes making public proceedings open to the public. 38 ALR3d 1070.**

4. **Municipal Corporations § 157 (NCI4th); State § 9 (NCI4th)— economic development grants—closed meetings—minutes reflecting only "sessions"—full and accurate minutes**

The Winston-Salem Board of Aldermen and the Forsyth County Board of Commissioners did not violate the "full and accurate minutes" requirement of the Open Meetings Law set out in N.C.G.S. § 143-318.10(e) because the minutes of two closed sessions pertaining to economic development grants only stated "discussions" where no action was taken at the closed meetings.

**Am Jur 2d, Municipal Corporations, Counties, and Other Political Subdivisions §§ 155 et seq.**

**Validity, construction, and application of statutes making public proceedings open to the public. 38 ALR3d 1070.**

Justice ORR dissenting.

Justice LAKE joins in this dissenting opinion.

On discretionary review pursuant to N.C.G.S. § 7A-31, prior to a determination by the Court of Appeals, of a judgment entered on 28

## MAREADY v. CITY OF WINSTON-SALEM

[342 N.C. 708 (1996)]

August 1995 by Rousseau, J., in Superior Court, Forsyth County, enjoining defendants from making incentive grants or otherwise committing public funds for economic incentive purposes pursuant to N.C.G.S. § 158-7.1. Heard in the Supreme Court 16 February 1996.

*Robinson Maready Lawing & Comerford, L.L.P., by William F. Maready and Michael L. Robinson, for plaintiff-appellant and -appellee.*

*Womble Carlyle Sandridge & Rice, P.L.L.C., by Roddey M. Ligon, Jr., for City and County; P. Eugene Price, Jr., Forsyth County Attorney; Ronald G. Seeber, Winston-Salem City Attorney; and Petree Stockton, L.L.P., by J. Robert Elster and Julia C. Archer, for Winston-Salem Business, Inc., defendant-appellants and -appellees.*

*Michael F. Easley, Attorney General; John R. McArthur, Chief Counsel; Andrew A. Vanore, Jr., Chief Deputy Attorney General; and W. Wallace Finlator, Jr., and Jane T. Friedensen, Assistant Attorneys General, for defendant-intervenor-appellant and -appellee.*

*Andrew L. Romanet, Jr., General Counsel, and Gregory F. Schwitzgebel III, Assistant General Counsel, for the North Carolina League of Municipalities; and James B. Blackburn III, General Counsel, and Kimberly M. Grantham, Assistant General Counsel, for the North Carolina Association of County Commissioners, amici curiae.*

*Everett Gaskins Hancock & Stevens, by Hugh Stevens and C. Amanda Martin, for Piedmont Publishing Company and The North Carolina Press Association, amici curiae.*

*Harry Pavilak & Associates, by David C. Harr, for Southeastern Legal Foundation, amicus curiae.*

*The Sanford Law Firm, P.L.L.C., by Ernest C. Pearson, Robert M. Jessup, Jr., and Ellen D. Andrews, for The North Carolina Economic Developers Association, amicus curiae.*

*Poyner & Spruill, L.L.P., by S. Ellis Hankins, for ElectriCities of North Carolina, Inc., amicus curiae.*

*Stam, Fordham & Danchi, P.A., by Paul Stam, Jr., for John Locke Foundation, Inc., amicus curiae.*

*Kary L. Moss for The Corporation for Enterprise Development, The Calumet Project for Industrial Jobs, Share the Wealth, The Grass Roots Policy Project, The Maurice and Jane Sugar Law Center for Economic and Social Justice, and The Federation for Industrial Retention and Renewal, amici curiae.*

WHICHARD, Justice.

[1]   Plaintiff-appellant, William F. Maready, instituted this action against the City of Winston-Salem, its Board of Aldermen, Forsyth County, its Board of Commissioners, and Winston-Salem Business, Inc. Plaintiff contends that N.C.G.S. § 158-7.1, which authorizes local governments to make economic development incentive grants to private corporations, is unconstitutional because it violates the public purpose clause of the North Carolina Constitution and because it is impermissibly vague, ambiguous, and without reasonably objective standards. Plaintiff also argues that the local governing bodies violated the State's Open Meetings Law by voting on and deciding grant matters in closed sessions.

Following a three-day evidentiary hearing and oral argument, the trial court found N.C.G.S. § 158-7.1 unconstitutional, enjoined defendants from making further incentive grants or otherwise committing public funds pursuant to that statute, denied plaintiff's motion for a mandatory injunction to require the City and County to recover incentive grants from recipients thereof, and dismissed the claim that defendants violated the Open Meetings Law. All parties appealed, and on 2 November 1995 this Court granted defendant-appellants' petition for discretionary review prior to a determination by the Court of Appeals.

Plaintiff is a citizen and resident of Winston-Salem and Forsyth County. He owns real and personal property upon which Winston-Salem and Forsyth County levy property taxes. Defendants are the City of Winston-Salem, its Board of Alderman, Forsyth County, and its Board of County Commissioners. Winston-Salem Business, Inc. ("WSBI"), also a defendant, is the name under which the Forsyth County Development Corporation does business. It is a not-for-profit corporation formed by private individuals in Forsyth County and is an arm of the Winston-Salem Chamber of Commerce. The State of North

## MAREADY v. CITY OF WINSTON-SALEM

[342 N.C. 708 (1996)]

Carolina, *ex rel.* Michael F. Easley, Attorney General, is a party defendant by way of voluntary intervention as a matter of right pursuant to Rule 24(a)(1) of the North Carolina Rules of Civil Procedure and N.C.G.S. § 1-260, in that the action seeks to have an act of the General Assembly of the State of North Carolina declared unconstitutional.

This action challenges twenty-four economic development incentive projects entered into by the City or County pursuant to N.C.G.S. § 158-7.1. The projected investment by the City and County in these projects totals approximately $13,200,000. The primary source of these funds has been taxes levied by the City and County on property owners in Winston-Salem and Forsyth County. City and County officials estimate an increase in the local tax base of $238,593,000 and a projected creation of over 5,500 new jobs as a result of these economic development incentive programs. They expect to recoup the full amount of their investment within three to seven years. The source of the return will be revenues generated by the additional property taxes paid by participating corporations. To date, all but one project has met or exceeded its goal.

The typical procedures the City and County observe in deciding to make an economic development incentive expenditure are as follows: A determination is made that participation by local government is necessary to cause a project to go forward in the community. Officials then apply a formula set out in written guidelines to determine the maximum amount of assistance that can be given to the receiving corporation. The amounts actually committed are usually much less than the maximum. The expenditures are in the form of reimbursement to the recipient for purposes such as on-the-job training, site preparation, facility upgrading, and parking. If a proposal satisfies the guidelines as well as community needs, it is submitted to the appropriate governing body for final approval at a regularly scheduled public meeting. If a project is formally approved, it is administered pursuant to a written contract and to the applicable provisions and limitations of N.C.G.S. § 158-7.1.

Article V, Section 2(1) of the North Carolina Constitution provides that "[t]he power of taxation shall be exercised in a just and equitable manner, for public purposes only." In *Mitchell v. North Carolina Indus. Dev. Fin. Auth.*, 273 N.C. 137, 159 S.E.2d 745 (1968), Justice (later Chief Justice) Sharp, writing for a majority of this Court, stated:

The power to appropriate money *from* the public treasury is no greater than the power to levy the tax which put the money in the treasury. Both powers are subject to the constitutional proscription that tax revenues may not be used for private individuals or corporations, no matter how benevolent.

*Id.* at 143, 159 S.E.2d at 749-50.

In determining whether legislation serves a public purpose, the presumption favors constitutionality. *State v. Furmage,* 250 N.C. 616, 621, 109 S.E.2d 563, 567 (1959). Reasonable doubt must be resolved in favor of the validity of the act. *Wells v. Housing Auth. of Wilmington,* 213 N.C. 744, 749, 197 S.E. 693, 696 (1938). The Constitution restricts powers, and powers not surrendered inhere in the people to be exercised through their representatives in the General Assembly; therefore, so long as an act is not forbidden, its wisdom and expediency are for legislative, not judicial, decision. *McIntyre v. Clarkson,* 254 N.C. 510, 515, 119 S.E.2d 888, 891-92 (1961).

In exercising the State's police power, the General Assembly may legislate for the protection of the general health, safety, and welfare of the people. *Martin v. North Carolina Hous. Corp.,* 277 N.C. 29, 45, 175 S.E.2d 665, 674 (1970). It may "experiment with new modes of dealing with old evils, except as prevented by the Constitution." *Redevelopment Comm'n of Greensboro v. Security Nat'l Bank of Greensboro,* 252 N.C. 595, 612, 114 S.E.2d 688, 700 (1960). The initial responsibility for determining what constitutes a public purpose rests with the legislature, and its determinations are entitled to great weight. *In re Housing Bonds,* 307 N.C. 52, 57, 296 S.E.2d 281, 285 (1982).

The enactment of N.C.G.S. § 158-7.1 leaves no doubt that the General Assembly considers expenditures of public funds for the promotion of local economic development to serve a public purpose. Under this statute,

[e]ach county and city in this State is authorized to make appropriations for the purposes of aiding and encouraging the location of manufacturing enterprises, making industrial surveys and locating industrial and commercial plants in or near such city or in the county; encouraging the building of railroads or other purposes which, in the discretion of the governing body of the city or of the county commissioners of the county, *will increase the population, taxable property, agricultural industries and business*

*prospects of any city or county.* These appropriations may be funded by the levy of property taxes pursuant to G.S. 153A-149 and 160A-209 and by the allocation of other revenues whose use is not otherwise restricted by law.

N.C.G.S. § 158-7.1(a) (1994) (emphasis added). When making amendments to chapter 158 and adding other provisions designed to promote economic development, the General Assembly mandated: "This act, being necessary for the prosperity and welfare of the State and its inhabitants, shall be liberally construed to effect these purposes." Act of July 23, 1993, ch. 497, sec. 25, 1993 N.C. Sess. Laws 1932, 1961 (amending the Constitution to permit cities and counties to issue bonds to finance the public portion of economic development projects and to authorize counties and cities to accept as consideration for a conveyance or lease of property to a private party the amount of increased tax revenue expected to be generated by the improvements to be constructed on the property). The General Assembly has further demonstrated its commitment to economic development by enacting several other statutes that permit local governments to appropriate and spend public funds for such purposes. These include, *inter alia*:

> N.C.G.S. §§ 158-8 through -15, which establish regional economic development commissions and authorize local governments to create or join economic development commissions and to support them with their funds.

> N.C.G.S. § 160A-209(c), which provides: "Each city may levy property taxes for one or more of the following purposes . . . : (10b) Economic Development—To provide for economic development as authorized by G.S. 158-12. . . . (17a) Industrial Development.— To provide for industrial development as authorized by G.S. 158-7.1."

> N.C.G.S. § 153A-149(c), which provides: "Each county may levy property taxes for one or more of the purposes listed in this subsection . . . : (10b) Economic Development—To provide for economic development as authorized by G.S. 158-12. . . . (16a) Industrial Development—To provide for industrial development as authorized by G.S. 158-7.1."

These enactments clearly indicate that N.C.G.S. § 158-7.1 is part of a comprehensive scheme of legislation dealing with economic development whereby the General Assembly is attempting to authorize exercise of the power of taxation for the perceived public purpose of pro-

moting the general economic welfare of the citizens of North Carolina.

While legislative declarations such as these are accorded great weight, ultimate responsibility for the public purpose determination rests with this Court. *Madison Cablevision v. City of Morganton*, 325 N.C. 634, 644-45, 386 S.E.2d 200, 206 (1989). If an enactment is for a private purpose and therefore inconsistent with the fundamental law, it cannot be saved by legislative declarations to the contrary. It is the duty of this Court to ascertain and declare the intent of the framers of the Constitution and to reject any act in conflict therewith. *State v. Felton*, 239 N.C. 575, 578, 80 S.E.2d 625, 628 (1954); *Nash v. Town of Tarboro*, 227 N.C. 283, 290, 42 S.E.2d 209, 214 (1947).

This Court has addressed what constitutes a public purpose on numerous occasions. It has not specifically defined "public purpose," however; rather, it has expressly declined to "confine public purpose by judicial definition[, leaving] 'each case to be determined by its own peculiar circumstances as from time to time it arises.' " *Stanley v. Department of Conservation & Dev.*, 284 N.C. 15, 33, 199 S.E.2d 641, 653 (1973) (quoting *Keeter v. Town of Lake Lure*, 264 N.C. 252, 264, 141 S.E.2d 634, 643 (1965)). As summarized by Justice Sharp in *Mitchell*:

> A slide-rule definition to determine public purpose for all time cannot be formulated; the concept expands with the population, economy, scientific knowledge, and changing conditions. As people are brought closer together in congested areas, the public welfare requires governmental operation of facilities which were once considered exclusively private enterprises, and necessitates the expenditure of tax funds for purposes which, in an earlier day, were not classified as public. Often public and private interests are so co-mingled that it is difficult to determine which predominates. It is clear, however, that for a use to be public its benefits must be in common and not for particular persons, interests, or estates; the ultimate net gain or advantage must be the public's as contradistinguished from that of an individual or private entity.

*Mitchell*, 273 N.C. at 144, 159 S.E.2d at 750 (citations omitted).

Plaintiff requests that we take judicial notice of the 1993 proposed constitutional amendment regarding economic development financing bonds which was soundly defeated by the voters of North Carolina. Were we to do so, his argument concerning the constitu-

MAREADY v. CITY OF WINSTON-SALEM

[342 N.C. 708 (1996)]

tionality of N.C.G.S. § 158-7.1 would not be bolstered thereby. The proposed amendment would have authorized "any county, city, or town to define territorial areas in the county, city, or town, and borrow money, without need of voter approval, to be used to finance public activities associated with private economic development projects within territorial areas." Ch. 497, sec. 1, 1993 N.C. Sess. Laws at 1933. This amendment would have been conceptually different from N.C.G.S § 158-7.1. Section 158-7.1 allows local governments to appropriate funds for the purpose of economic development. Such appropriations involve money the government already has or readily will have. The proposed amendment, by contrast, would have allowed local governments to *borrow* money in order to issue economic development financing bonds, thereby spending money not already obtained and incurring debt that must ultimately be repaid with interest. The bonds would not have been secured by the full faith and credit of the governing body; thus, the governing body would essentially have been borrowing and spending on unsecured credit. Any resulting deficit would have directly affected the taxpayers, who would not even have been entitled to vote on the projects. Unlike N.C.G.S. § 158-7.1, the proposed amendment had few internal safeguards and had the potential for adverse financial repercussions to the taxpayers. Thus, the public's rejection of the proposed amendment has no bearing on the constitutionality of N.C.G.S. § 158-7.1, which is the question before us.

Plaintiff also argues, and the trial court apparently agreed, that this question falls squarely within the purview of *Mitchell v. North Carolina Industrial Development Financing Authority.* There we held unconstitutional the Industrial Facilities Financing Act, a statute that authorized issuance of industrial revenue bonds to finance the construction and equipping of facilities for private corporations. The suit was filed as a test case, before any bonds were issued, to enjoin the appropriation of $37,000 from the State Contingency and Emergency Fund for the purpose of enabling the Authority to organize and begin operations. We find *Mitchell* distinguishable.

One of the bases for the *Mitchell* decision was that the General Assembly had unenthusiastically passed the enacting legislation, declaring it to be bad policy. The opinion stated:

At the time the General Assembly passed the Act, it declared in Resolution No. 52 that it considered the Act bad public policy. It explained that it felt compelled to authorize industrial revenue

bonds in order to compete for industry with neighboring states which use them. As proof of its reluctance to join the industry-subsidizing group of states, the General Assembly requested the President and the other forty-nine states to petition Congress to make the interest on all such bonds thereafter issued subject to all applicable income-tax laws.

*Mitchell,* 273 N.C. at 146, 159 S.E.2d at 751. The resolution recited that the General Assembly passed the act reluctantly, with reservations, and as a defensive measure. *Id.* at 141, 159 S.E.2d at 748. The Assembly's obvious apprehension over using public funds to benefit private entities in this manner clearly served to undermine the Court's confidence in the constitutionality of the legislation. The converse is true here in that the Assembly has unequivocally embraced expenditures of public funds for the promotion of local economic development as advancing a public purpose.

Further, and more importantly, the holding in *Mitchell* clearly indicates that the Court considered private industry to be the primary benefactor of the legislation and considered any benefit to the public purely incidental. Notwithstanding its recognition that any lawful business in a community promotes the public good, the Court held that the "Authority's primary function, to acquire sites and to construct and equip facilities for private industry, is not for a public use or purpose." *Id.* at 159, 159 S.E.2d at 761. The Court rightly concluded that direct state aid to a private enterprise, with only limited benefit accruing to the public, contravenes fundamental constitutional precepts. In reiterating that it is not the function of the government to engage in private business, the opinion quoted with approval the following language from the Supreme Court of Idaho:

"An exemption which arbitrarily prefers one private enterprise operating by means of facilities provided by a municipality, over another engaged, or desiring to engage, in the same business in the same locality, is neither necessary nor just. . . . It is obvious that private enterprise, not so favored, could not compete with industries operating thereunder. If the state-favored industries were successfully managed, private enterprise would of necessity be forced out, and the state, through its municipalities, would increasingly become involved in promoting, sponsoring, regulating and controlling private business, and our free private enterprise economy would be replaced by socialism. The constitutions of both state and nation were founded upon a capitalistic private

enterprise economy and were designed to protect and foster private property and private initiative."

*Id.* at 153, 159 S.E.2d at 756 (quoting *Village of Moyie Springs v. Aurora Mfg. Co.*, 82 Idaho 337, 349-50, 353 P.2d 767, 775 (1960)). Thus, the Court implicitly rejected the act because its primary object was private gain and its nature and purpose did not tend to yield public benefit.

These concerns also influenced the Court in *Stanley v. Department of Conservation & Dev.*, 284 N.C. 15, 199 S.E.2d 641, which plaintiff also contends is binding precedent. In *Stanley* this Court was asked to determine the constitutionality of the Pollution Abatement and Industrial Facilities Financing Act, which allowed the creation of county authorities to finance pollution control or industrial facilities for private industry by the issuance of tax-exempt revenue bonds. The Court held the Act unconstitutional. The result in *Stanley* turned on the fact that the Act in question was "[p]atently . . . designed to enable industrial polluters to finance, at the lowest interest rate obtainable, the pollution abatement and control facilities which the law is belatedly requiring of them." *Id.* at 32, 199 S.E.2d at 653. The Court noted that "[i]n determining what is a public purpose the courts look not only to the end sought to be attained but also 'to the means to be used.' " *Id.* at 34, 199 S.E.2d at 653 (quoting *Turner v. City of Reidsville*, 224 N.C. 42, 44, 29 S.E.2d 211, 213 (1944)). As in *Mitchell*, the Court repeatedly asserted that direct assistance to a private concern by the use of tax-exempt revenue-bond financing could not be the means used to effect a public purpose. The Court concluded that "[p]ollution control facilities are single-purpose facilities, useful only to the industry for which they would be acquired." *Id.* at 39, 199 S.E.2d at 657. Therefore, "[t]he conclusion is inescapable that [the private corporation] is the only direct beneficiary of the tax-exempt revenue bonds which the . . . Authorities propose to issue and that the benefit to the public is only incidental or secondary." *Id.* at 38, 199 S.E.2d at 656.

Thus, as in *Mitchell*, the outcome flowed inexorably from the fundamental concept underlying the public purpose doctrine, *viz*, that the ultimate gain must be the public's, not that of an individual or private entity. Significantly, the direct holdings of these cases—that industrial revenue bond financing is unconstitutional—were overturned by a specific constitutional amendment. In 1973 the North Carolina Constitution was amended to add Article V, Section 9, which

allows counties to create authorities to issue revenue bonds for industrial and pollution control facilities. While this amendment was narrowly tailored to address a specific situation, it nonetheless diminishes the significance of *Mitchell* and *Stanley* in the context presented here.

Moreover, the Court's focal concern in *Mitchell* and *Stanley*, the means used to achieve economic growth, has also been removed by constitutional amendment. In 1973 Article V, Section 2(7) was added to the North Carolina Constitution, specifically allowing direct appropriation to private entities for public purposes. This section provides:

The General Assembly may enact laws whereby the State, any county, city or town, and any other public corporation may contract with and appropriate money to any person, association, or corporation for the accomplishment of public purposes only.

N.C. Const. art. V, § 2(7). "[U]nder subsection (7) *direct disbursement* of public funds to private entities is a constitutionally permissible *means* of accomplishing a public purpose provided there is statutory authority to make such appropriation." *Hughey v. Cloninger*, 297 N.C. 86, 95, 253 S.E.2d 898, 904 (1979). Hence, the constitutional problem under the public purpose doctrine that the Court perceived in *Mitchell* and *Stanley* no longer exists.

While *Mitchell* and its progeny remain pivotal in the development of the doctrine, they do not purport to establish a permanent test for determining the existence of a public purpose. The majority in *Mitchell* posed the question: "Is it *today* a proper function of government for the State to provide a site and equip a plant for private industrial enterprise?" *Mitchell*, 273 N.C. at 145, 159 S.E.2d at 751 (emphasis added). This explicit recognition of the importance of contemporary circumstances in assessing the public purpose of governmental endeavors highlights the essential fluidity of the concept. While the *Mitchell* majority answered the question in the negative, the passage of time and accompanying societal changes now suggest a positive response.

This Court is no stranger to the question of what activities are and are not for a public purpose. The following cases demonstrate the great variety of facilities, authorities, and activities which have been deemed to be public purposes. **Aid to Establish a Teachers Training School**: *Cox v. Commissioners of Pitt Co.*, 146 N.C. 584, 60

MAREADY v. CITY OF WINSTON-SALEM

[342 N.C. 708 (1996)]

S.E. 516 (1908); **Aid to Railroad**: *Wood v. Commissioners of Oxford*, 97 N.C. 227, 2 S.E. 653 (1887); **Airport Facilities**: *Greensboro-High Point Airport Auth. v. Johnson*, 226 N.C. 1, 36 S.E.2d 803 (1946) (regional airport); *Turner v. City of Reidsville*, 224 N.C. 42, 29 S.E.2d 211 (municipal airport); *Goswick v. City of Durham*, 211 N.C. 687, 191 S.E. 728 (1937) (municipal airport); **Education Generally**: *State Educ. Assistance Auth. v. Bank of Statesville*, 276 N.C. 576, 174 S.E.2d 551 (1970) (a state revenue bond issue for loans to residents of slender means to facilitate their post-secondary education); *Green v. Kitchin*, 229 N.C. 450, 50 S.E.2d 545 (1948) (expenditure of tax revenues for a policeman to attend a training course); **Grain Handling Facility Financed by Revenue Bonds and to be Leased to a Private Concern**: *North Carolina State Ports Auth. v. First-Citizens Bank & Trust Co.*, 242 N.C. 416, 88 S.E.2d 109 (1955); **Moderate Income Housing**: *In re Housing Bonds*, 307 N.C. 52, 296 S.E.2d 281; **Municipal Appropriation of Non-tax Revenues to the Chamber of Commerce to Advertise the Advantages of Raleigh**: *Dennis v. City of Raleigh*, 253 N.C. 400, 116 S.E.2d 923 (1960); **Municipal Hospital**: *Trustees of Rex Hosp. v. Board of Comm'rs of Wake Co.*, 239 N.C. 312, 79 S.E.2d 892 (1954); *Burleson v. Board of Aldermen of Spruce Pine*, 200 N.C. 30, 156 S.E. 241 (1930); **North Carolina Housing Corporation, Low-Income Housing**: *Martin v. North Carolina Hous. Corp.*, 277 N.C. 29, 175 S.E.2d 665; **Off-Street Parking Under Certain Circumstances**: *Henderson v. City of New Bern*, 241 N.C. 52, 84 S.E.2d 283 (1954); **Port Terminal Facilities**: *Webb v. Port Comm'n of Morehead City*, 205 N.C. 663, 172 S.E. 377 (1934); **Public Auditorium**: *Adams v. City of Durham*, 189 N.C. 232, 126 S.E. 611 (1925); **Public Housing Authority Under Federal Housing Acts**: *Mallard v. Eastern Carolina Regional Hous. Auth.*, 221 N.C. 334, 20 S.E.2d 281 (1942); **Public Library**: *Jamison v. City of Charlotte*, 239 N.C. 682, 80 S.E.2d 904 (1954); **Public Park**: *Purser v. Ledbetter*, 227 N.C. 1, 40 S.E.2d 702 (1946) (public parks, playgrounds, and recreational facilities are not a necessary expense, although a public purpose; *Atkins v. City of Durham*, 210 N.C. 295, 186 S.E. 330 (1936), will not "be followed as a precedent"); *Twining v. City of Wilmington*, 214 N.C. 655, 200 S.E. 416 (1939) (parks and playgrounds were not a necessary expense for Wilmington, although they were for a public purpose); *Yarborough v. North Carolina Park Comm'n*, 196 N.C. 284, 145 S.E. 563 (1928) (playgrounds and parks were "necessary expenses" within constitutional limitation on pledging credit without a vote of the people); **Public Schools**: *Collie v. Commissioners of Franklin Co.*, 145 N.C. 170, 59 S.E. 44 (1907);

**Purchase of a Lake and a Generating Plant**: *Keeter v. Town of Lake Lure*, 264 N.C. 252, 141 S.E.2d 634; **Railway Terminal Facilities**: *Hudson v. City of Greensboro*, 185 N.C. 502, 117 S.E. 629 (1923); **State Fair**: *Briggs v. City of Raleigh*, 195 N.C. 223, 141 S.E. 597 (1928); **Urban Renewal Project**: *Horton v. Redevelopment Comm'n of High Point*, 262 N.C. 306, 137 S.E.2d 115 (1964); **Voter-Approved Sale of Municipal Bonds for the Construction of an Armory Outside the Corporate Limits**: *Morgan v. Town of Spindale*, 254 N.C. 304, 118 S.E.2d 913 (1961); **World War I Veterans' Loan Fund**: *Hinton v. Lacy*, 193 N.C. 496, 137 S.E. 669 (1927). While these cases are not necessarily consistent and may not have involved industrial development as the challenged project, they reflect a trend toward broadening the scope of what constitutes a valid public purpose that permits the expenditure of public revenues. The General Assembly may provide for, *inter alia*, roads, schools, housing, health care, transportation, and occupational training. It would be anomalous to now hold that a government which expends large sums to alleviate the problems of its citizens through multiple humanitarian and social programs is proscribed from promoting the provision of jobs for the unemployed, an increase in the tax base, and the prevention of economic stagnation.

This Court most recently addressed the public purpose question in *Madison Cablevision v. City of Morganton*, 325 N.C. 634, 386 S.E.2d 200, where it unanimously held that N.C.G.S. § 160A, art. 16, part 1, which authorizes cities to finance, acquire, construct, own, and operate cablevision systems, does not violate the public purpose clause of Article V, Section 2(1). The Court stated that "[t]wo guiding principles have been established for determining that a particular undertaking by a municipality is for a public purpose: (1) it involves a reasonable connection with the convenience and necessity of the particular municipality; and (2) the activity benefits the public generally, as opposed to special interests or persons." *Madison Cablevision*, 325 N.C. at 646, 386 S.E.2d at 207 (citations omitted). Application of these principles here mandates the conclusion that N.C.G.S. § 158-7.1 furthers a public purpose and hence is constitutional.

As to the first prong, whether an activity is within the appropriate scope of governmental involvement and is reasonably related to communal needs may be evaluated by determining how similar the activity is to others which this Court has held to be within the permissible realm of governmental action. We conclude that the activities

**MAREADY v. CITY OF WINSTON-SALEM**

[342 N.C. 708 (1996)]

N.C.G.S. § 158-7.1 authorizes are in keeping with those accepted as within the scope of permissible governmental action.

Economic development has long been recognized as a proper governmental function. In *Wood v. Town of Oxford*, 97 N.C. 227, 2 S.E. 653, this Court upheld the statutory, voter-approved borrowing of money for the purchase of railroad capital stock and donations by towns located along a privately owned, for-profit railroad. The Court stated:

> It may not always be easy to apply the rule of law to determine what is a legitimate object of such expenditures. It is clear, however, that they may be made for such public improvements and advantages as tend directly to provide for and promote the general good, convenience and safety of the county or town making them, as an organized community, although the advantage derived may not reach every individual citizen or taxpayer residing there.

*Id.* at 231, 2 S.E. at 655. Even subsequent to *Mitchell*, this Court declared that stimulation of the economy involves a public purpose. *State ex rel. Util. Comm'n v. Edmisten*, 294 N.C. 598, 242 S.E.2d 862 (1978), involved a challenge to Utilities Commission approval of a rate increase to subsidize exploration for natural gas by private companies. In upholding the Commission's action, the Court said:

> Stimulation of the economy is an essential public and governmental purpose and the manner in which this purpose is to be accomplished is, within constitutional limits, exclusively a legislative decision . . . .
>
> . . . .
>
> We hold here . . . that the severe adverse economic effects sought to be avoided by approval and funding of these exploration projects present a sufficient public concern to outweigh the infringement, if any there be, arising from the rate increases ordered by the Commission.

*Id.* at 610, 611, 242 S.E.2d at 874. While this decision did not interpret the public purpose clause of the Constitution, it is nevertheless instructive as illustrating judicial acceptance of the promotion of economic development as a valid public purpose.

Further, the activities N.C.G.S. § 158-7.1 authorizes invoke traditional governmental powers and authorities in the service of eco-

nomic development. For example, subsections 158-7.1(b)(5) and (6) authorize economic development expenditures in connection with local government operation of water, sewer, and other utility systems, matters long considered a proper role of government. Likewise, the power under (b)(1) to acquire land for an industrial park, develop it for its intended use, and then convey it is analogous to the powers granted by the Urban Redevelopment Law (chapter 160A, article 22), which this Court has consistently upheld as meeting the public purpose test. *See Redevelopment Comm'n of Greensboro v. Security Nat'l Bank of Greensboro*, 252 N.C. 595, 114 S.E.2d 688. Urban redevelopment commissions have power to acquire property, clear slums, and sell the property to private developers. In that instance, as here, a private party ultimately acquires the property and conducts activities which, while providing incidental private benefit, serve a primary public goal.

As to the second prong of the *Madison Cablevision* inquiry, under the expanded understanding of public purpose, even the most innovative activities N.C.G.S. § 158-7.1 permits are constitutional so long as they primarily benefit the public and not a private party. "It is not necessary, in order that a use may be regarded as public, that it should be for the use and benefit of every citizen in the community." *Briggs v. City of Raleigh*, 195 N.C. 223, 226, 141 S.E. 597, 599-600. Moreover, an expenditure does not lose its public purpose merely because it involves a private actor. Generally, if an act will promote the welfare of a state or a local government and its citizens, it is for a public purpose.

Viewed in this light, section 158-7.1 clearly serves a public purpose. Its self-proclaimed end is to "increase the population, taxable property, agricultural industries and business prospects of any city or county." N.C.G.S. § 158-7.1(a). However, it is the natural consequences flowing therefrom that ensure a net public benefit. The expenditures this statute authorizes should create a more stable local economy by providing displaced workers with continuing employment opportunities, attracting better paying and more highly skilled jobs, enlarging the tax base, and diversifying the economy. Careful planning pursuant to the statute should enable optimization of natural resources while concurrently preserving the local infrastructure. The strict procedural requirements the statute imposes provide safeguards that should suffice to prevent abuse.

MAREADY v. CITY OF WINSTON-SALEM

[342 N.C. 708 (1996)]

The public advantages are not indirect, remote, or incidental; rather, they are directly aimed at furthering the general economic welfare of the people of the communities affected. While private actors will necessarily benefit from the expenditures authorized, such benefit is merely incidental. It results from the local government's efforts to better serve the interests of its people. Each community has a distinct ambience, unique assets, and special needs best ascertained at the local level. Section 158-7.1 enables each to formulate its own definition of economic success and to draft a developmental plan leading to that goal. This aim is no less legitimate and no less for a public purpose than projects this Court has approved in the past.

Finally, while this Court does not pass upon the wisdom or propriety of legislation in determining the primary motivation behind a statute, it may consider the circumstances surrounding its enactment. In that regard, a Legislative Research Commission committee made a report to the 1989 General Assembly, warning that:

The traditional foundations of North Carolina's economy—agriculture and manufacturing—are in decline. And, the traditional economic development tool—industrial recruitment—has proven inadequate for many of North Carolina's communities. Low wages and low taxes are no longer sufficient incentives to entice new industry to our State, especially to our most remote, most distressed areas.

N.C. Legislative Research Commission, Committee on Economic Development and Recruiting, Report to the 1989 N.C. General Assembly, at 15. In the economic climate thus depicted, the pressure to induce responsible corporate citizens to relocate to or expand in North Carolina is not internal only, but results from the actions of other states as well. To date, courts in forty-six states have upheld the constitutionality of governmental expenditures and related assistance for economic development incentives.[1] Only California and

1. *See, e.g., Smith v. Industrial Dev. Bd. of Andalusia*, 455 So. 2d 839 (Ala. 1984); *Wright v. City of Palmer*, 468 P.2d 326 (Alaska 1970); *Industrial Dev. Auth. of Pinal Co. v. Nelson*, 109 Ariz. 368, 509 P.2d 705 (1973); *Andres v. First Ark. Dev. Fin. Corp.*, 230 Ark. 594, 324 S.W.2d 97 (1959); *In Re Interrogatory Propounded by Governor*, 814 P.2d 875 (Colo. 1991); *Wilson v. Connecticut Prod. Dev. Corp.*, 167 Conn. 111, 355 A.2d 72 (1974); *Roan v. Connecticut Indus. Bldg. Comm'n*, 150 Conn. 333, 189 A.2d 399 (1963); *In re Opinion of Justices*, 54 Del. 366, 177 A.2d 205 (1962); *Linscott v. Orange Co. Indus. Dev. Auth.*, 443 So. 2d 97 (Fla. 1983); *Nations v. Downtown Dev. Auth. of Atlanta*, 255 Ga. 324, 338 S.E.2d 240 (1985); *State ex rel. Amemiya v. Anderson*, 56 Haw. 566, 545 P.2d 1175 (1976); *Potter v. Judge*, 112 Ill. App. 3d 81, 444 N.E.2d 821

MAREADY v. CITY OF WINSTON-SALEM

[342 N.C. 708 (1996)]

Idaho lack reported decisions on this issue, though they too have statutes authorizing such expenditures. The Supreme Court of Washington has struck a pollution control facility financing plan as providing for loans in violation of a state constitutional prohibition against municipal loans to private corporations, regardless of whether the loans served a public purpose. *Port of Longview v. Taxpayers of Port of Longview*, 84 Wash. 2d 475, 527 P.2d 263 (1974), *modified*, 85 Wash. 2d 216, 533 P.2d 128 (1975). That court has not held governmental expenditures for economic incentives unconstitutional as not for a public purpose, however. Thus, by virtue of the trial court's ruling, North Carolina currently stands alone in so holding. Considered in this light, it would be unrealistic to assume that the State will not suffer economically in the future if the incentive pro-

---

(1983); *Hawkins v. City of Greenfield*, 248 Ind. 593, 230 N.E.2d 396 (1967); *Brady v. City of Dubuque*, 495 N.W.2d 701 (Iowa 1993); *Duckworth v. City of Kansas City*, 243 Kan. 386, 758 P.2d 201 (1988); *Hayes v. State Property & Bldgs. Comm'n*, 731 S.W.2d 797 (Ky. 1987); *Farlouis v. LaRock*, 315 So. 2d 50 (La. Ct. App. 1975); *Common Cause v. State*, 455 A.2d 1 (Me. 1983); *Williams v. Anne Arundel Co.*, 334 Md. 109, 638 A.2d 74 (1994); *Reyes v. Prince George's Co.*, 281 Md. 279, 380 A.2d 12 (1977); *Opinion of the Justices to the House of Representatives*, 368 Mass. 880, 335 N.E.2d 362 (1975); *Poletown Neighborhood Council v. City of Detroit*, 410 Mich. 616, 304 N.W.2d 455 (1981); *City of Gaylord v. Beckett*, 378 Mich. 273, 144 N.W.2d 460 (1966); *Minnesota Energy & Econ. Dev. Auth. v. Printy*, 351 N.W.2d 319 (Minn. 1984); *Board of Supervisors of Lamar Co. v. Hattiesburg Coca-Cola Bottling Co.*, 448 So. 2d 917 (Miss. 1984); *State ex rel. Wagner v. St. Louis Co. Port Auth.*, 604 S.W.2d 592 (Mo. 1980); *Fickes v. Missoula Co.*, 155 Mont. 258, 470 P.2d 287 (1970); *Chase v. Douglas Co.*, 195 Neb. 838, 241 N.W.2d 334 (1976); *State ex rel. Brennan v. Bowman*, 89 Nev. 330, 512 P.2d 1321 (1973); *Opinion of the Justices*, 112 N.H. 42, 288 A.2d 697 (1972); *Roe v. Kervick*, 42 N.J. 191, 199 A.2d 834 (1964); *Kennecott Copper Corp. v. Town of Hurley*, 84 N.M. 743, 507 P.2d 1074 (1973); *Village of Deming v. Hosdreg Co.*, 62 N.M. 18, 303 P.2d 920 (1956); *Yonkers Community Dev. Agency v. Morris*, 37 N.Y.2d 478, 335 N.E.2d 327, 373 N.Y.S.2d 112, *appeal dismissed*, 423 U.S. 1010, 46 L. Ed. 2d 381 (1975); *Gripentrog v. City of Wahpeton*, 126 N.W.2d 230 (N.D. 1964); *Stark Co. v. Ferguson*, 2 Ohio App. 3d 72, 440 N.E.2d 816 (1981); *Burkhardt v. City of Enid*, 771 P.2d 608 (Okla. 1989); *Carruthers v. Port of Astoria*, 249 Or. 329, 438 P.2d 725 (1968); *Basehore v. Hampden Indus. Dev. Auth.*, 433 Pa. 40, 248 A.2d 212 (1968); *In Re Advisory Opinion to Governor*, 113 R.I. 586, 324 A.2d 641 (1974); *Nichols v. South Carolina Research Auth.*, 290 S.C. 415, 351 S.E.2d 155 (1986); *Clem v. City of Yankton*, 83 S.D. 386, 160 N.W.2d 125 (1968); *West v. Industrial Dev. Bd. of Nashville*, 206 Tenn. 154, 332 S.W.2d 201 (1960); *Atwood v. Willacy Co. Navigation Dist.*, 271 S.W.2d 137 (Tex. Ct. App. 1954), *appeal dismissed*, 350 U.S. 804, 100 L. Ed. 723 (1955); *Utah Technology Fin. Corp. v. Wilkinson*, 723 P.2d 406 (Utah 1986); *Vermont Home Mortgage Credit Agency v. Montpelier Nat'l Bank*, 128 Vt. 272, 262 A.2d 445 (1970); *City of Charlottesville v. DeHaan*, 228 Va. 578, 323 S.E.2d 131 (1984); *Mayor of Lexington v. Industrial Dev. Auth. of Rockbridge Co.*, 221 Va. 865, 275 S.E.2d 888 (1981); *State ex rel. Ohio Co. Comm'n v. Samol*, 165 W. Va. 714, 275 S.E.2d 2 (1980); *State ex rel. Hammermill Paper Co. v. LaPlante*, 58 Wis. 2d 32, 205 N.W.2d 784 (1973); *Powers v. City of Cheyenne*, 435 P.2d 448 (Wyo. 1967).

grams created pursuant to N.C.G.S. § 158-7.1 are discontinued. As Chief Justice Parker noted in his dissent in *Mitchell*:

> North Carolina is no longer a predominantly agricultural community. We are developing from an agrarian economy to an agrarian and industrial economy. North Carolina is having to compete with the complex industrial, technical, and scientific communities that are more and more representative of a nation-wide trend. All men know that in our efforts to attract new industry we are competing with inducements to industry offered through legislative enactments in other jurisdictions as stated in the legislative findings and purposes of this challenged Act. It is manifest that the establishment of new industry in North Carolina will enrich a whole class of citizens who work for it, will increase the per capita income of our citizens, will mean more money for the public treasury, more money for our schools and for payment of our school teachers, more money for the operation of our hospitals like the John Umstead Hospital at Butner, and for other necessary expenses of government. This to my mind is clearly the business of government in the jet age in which we are living. Among factors to be considered in determining the effect of the challenged legislation here is the aggregate income it will make available for community distribution, the resulting security of their [sic] income, and the opportunities for more lucrative employment for those who desire to work for it.

*Mitchell*, 273 N.C. at 164, 159 S.E.2d at 764 (Parker, C.J., dissenting).

The General Assembly thus could determine that legislation such as N.C.G.S. § 158-7.1, which is intended to alleviate conditions of unemployment and fiscal distress and to increase the local tax base, serves the public interest. New and expanded industries in communities within North Carolina provide work and economic opportunity for those who otherwise might not have it. This, in turn, creates a broader tax base from which the State and its local governments can draw funding for other programs that benefit the general health, safety, and welfare of their citizens. The potential impetus to economic development, which might otherwise be lost to other states, likewise serves the public interest. We therefore hold that N.C.G.S. § 158-7.1, which permits the expenditure of public moneys for economic development incentive programs, does not violate the public purpose clause of the North Carolina Constitution. Accordingly, the decision of the trial court on this issue is reversed.

**[2]** Plaintiff further contends that even if N.C.G.S. § 158-7.1 meets the public purpose test, it is nevertheless unconstitutional as impermissibly vague and ambiguous, without reasonably objective standards, and incapable of reasonably certain interpretation. Specifically, plaintiff argues that the statute delegates legislative power to local governments both as to the making of the law—deciding who will receive appropriations and on what terms—and as to its execution. He contends that an act that allows local elected governing bodies to exercise discretion regarding the extent to or manner in which they will use the statutory authority is unconstitutional.

This view is inconsistent with prior decisions of this Court. In *Plemmer v. Matthewson*, 281 N.C. 722, 190 S.E.2d 204 (1972), for example, the Court rejected contentions that an annexation statute unconstitutionally delegated legislative authority without sufficient guidelines. It stated: " 'The decisions of this Court support the view that ordinary restrictions with respect to the delegation of power to an agency of the State, which exercises no function of government, do not apply to cities, towns, or counties.' " *Id.* at 726, 190 S.E.2d at 207 (quoting *In re Annexation Ordinances*, 253 N.C. 637, 649, 117 S.E.2d 795, 803-04 (1961)). This Court has explicitly recognized that cities and counties have authority to exercise broad discretion within statutory limits. In *Riddle v. Ledbetter*, 216 N.C. 491, 5 S.E.2d 542 (1939), it stated:

> A municipal corporation has only such powers as are granted to it by the General Assembly in its specific charter or by the general laws of the State applicable to all municipal corporations
> . . . .
>
> . . . [I]t is also true that a municipal corporation may exercise all the powers within the fair intent and purpose of its creation which are reasonably necessary to give effect to the powers expressly granted, and in doing this it may exercise discretion as to the means to the end.

*Id.* at 492-93, 5 S.E.2d at 543 (citations omitted); *see also Keeter v. Town of Lake Lure*, 264 N.C. 252, 263, 141 S.E.2d 634, 643.

Chapters 160A (Cities and Towns) and 153A (Counties) of the General Statutes also clarify that the General Assembly intended that local elected officials have considerable discretion in performing their duties. N.C.G.S. § 160A-4 provides:

It is the policy of the General Assembly that the cities of this State should have adequate authority to execute the powers, duties, privileges, and immunities conferred upon them by law. To this end, the provisions of this Chapter and of city charters shall be broadly construed and grants of power shall be construed to include any additional and supplementary powers that are reasonably necessary or expedient to carry them into execution and effect: Provided, that the exercise of such additional or supplementary powers shall not be contrary to State or federal law or to the public policy of this State.

N.C.G.S. § 160A-4 (1994). N.C.G.S. § 153A-4 contains similar language applicable to counties. In *Homebuilders Ass'n of Charlotte, Inc. v. City of Charlotte*, 336 N.C. 37, 45, 442 S.E.2d 45, 50 (1994), this Court applied the broad rule of construction in N.C.G.S. § 160A-4 in holding that the City of Charlotte possessed the authority and discretion to charge user fees for regulatory services even though there was no express statutory authority therefor.

In this case, the General Assembly has given discretion to the elected governing bodies of cities and counties pursuant to N.C.G.S. § 158-7.1(a) to determine when economic development incentives will aid and encourage the location of manufacturing enterprises and increase the population, taxable property, agricultural industries, and business prospects of the city or county. Having made such determinations, they may then exercise discretion about whether to make an economic development expenditure and the nature and amount thereof. Subsections (b) through (f) state in greater detail the authority for local governments to make specific types of economic development expenditures. The statute leaves it to the duly elected governing bodies of the cities and counties to exercise discretion as to the manner and extent to which the authority will be used. The General Assembly specifically stated in subsection (b) that the enumerated specifics did not limit the broad authority granted in subsection (a).

These provisions evince an evident legislative purpose to give local governments considerable flexibility and discretion to execute the perceived public purpose of economic development in communities within their jurisdictions. As the foregoing cases indicate, the General Assembly could do this without running afoul of constitutional limitations. We conclude that the meaning and intent of

N.C.G.S. § 158-7.1 are sufficiently clear to pass constitutional muster; accordingly, this assignment of error is overruled.

[3] Plaintiff finally contends that the trial court erred in failing to find that defendants violated the North Carolina Open Meetings Law. He argues that the undisputed evidence shows that the County Commissioners and City Board of Aldermen met in closed sessions to discuss the amount of economic development incentives to offer private corporations and came to a group decision in private. Following the closed meetings, the boards either communicated directly with the corporations or had defendant WSBI act as the information conduit. In almost every instance, the boards expressly indicated to the private corporations that they would keep their decisions confidential until the corporation was ready to "go public" with the information.

N.C.G.S. § 143-318.10(a) provides that "each official meeting of a public body shall be open to the public, and any person is entitled to attend such a meeting." An "official meeting" is defined as

> a meeting, assembly, or gathering together at any time or place ... of a majority of the members of a public body for the purpose of conducting hearings, participating in deliberations, or voting upon or otherwise transacting the public business within the jurisdiction, real or apparent, of the public body.

N.C.G.S. § 143-318.10(d) (1993). Those seeking exemption have the burden of establishing that an exception embraces their action. *See News & Observer Publishing Co. v. Interim Bd. of Educ. for Wake Co.*, 29 N.C. App. 37, 47, 223 S.E.2d 580, 586-87 (1976). Such exceptions should be strictly construed. *Id.*

Section 143-318.11 sets forth specific exceptions to the general rule that the public must be allowed access to government meetings. Defendants contend that they were entitled to take the actions at issue because N.C.G.S. § 143-318.11(a)(4) allows closed meetings "[t]o discuss matters relating to the location or expansion of industries or other businesses in the area served by the public body."

The 1993 General Assembly considered repealing the economic development exception as part of its extensive revision of the Open Meetings Law. H.B. 120, 1993 N.C. General Assembly, at 3 (proposed deletion of former N.C.G.S. § 143-318.11(a)(6)). The 1993 amendment, however, left the exception permitting closed sessions for economic

**MAREADY v. CITY OF WINSTON-SALEM**

[342 N.C. 708 (1996)]

development discussions substantively unchanged. *See* N.C.G.S. § 143-318.11(a)(4) (Supp. 1995).

As a further requirement to any open meetings exception, North Carolina law provides that a "public body may hold a closed session only upon a motion duly made and adopted at an open meeting" and that the motion to meet in closed session must cite one of the permissible purposes listed in N.C.G.S. § 143-318.11(a). N.C.G.S. § 143-318.11(c). The trial court found that each closed session held to discuss economic development expenditures was preceded by a "motion and approving vote to go into closed session at an open and regularly scheduled public meeting. The motion stated that the closed session would be for the discussion of matters relating to the location or expansion of business or industry."

The trial court further found that during the closed sessions to discuss matters relating to the location or expansion of industries or businesses, no action was taken which would authorize any city or county official to sign a contract or to make any expenditure of funds:

> All actions taken by the Boards authorizing or approving the signing of an economic development contract or commitment and the payment of economic development expenditures on behalf of the Boards were taken in regularly scheduled public meetings. The agenda materials for those meetings contained the terms of the proposed economic development expenditure contract and were available to the media and to the general public at least four (4) days prior to said public meetings. Those economic development expenditures made pursuant to the provisions of N.C.G.S. § 158-7.1(b) through (f) were approved at regularly scheduled public meetings following publication of a notice of a public hearing with respect to the proposed economic development expenditure as provided in said statute.

After careful review of the transcripts and record, we conclude that there was competent evidence to support the trial court's findings of fact.

Plaintiff argues that the economic development exception, when strictly construed, does not permit the conduct that occurred during the closed sessions. He contends that the discussions and actions the boards undertook deviated substantially from the plain meaning of the terms used by the legislature and included details as to the nature and amount of subsidies to be paid to private corporations. The trial

court found that at the closed sessions in question, "[s]taff was given instructions as to further negotiations and the Board members did, in nine cases, indicate their *informal* approval regarding certain economic development incentives." (Emphasis added.) Any company receiving notice of a preliminary approval was also advised, however, that final approval at a public meeting would be required before any contract could be signed or any funds expended.

We first note that the statute contains no express limitation on a public body's discussion in closed meetings of matters relating to the location or expansion of industries or businesses. Further, it does not make preliminary or tentative approval during an authorized closed session unlawful. N.C.G.S. § 158-7.1(c) states that "[a]ny appropriation or expenditure pursuant to subsection (b) of this section must be approved by the county or city governing body after a public hearing." If the expenditure is for the acquisition of an interest in real property, the statute requires that the notice for the public hearing describe "the governing body's intention to approve the acquisition." *Id.* This language shows that the General Assembly intended for the governing body to reach a tentative conclusion before the public hearing. Because the Open Meetings Law authorizes a closed session to discuss the acquisition, and N.C.G.S. §\158-7.1(c) requires that notice of the public hearing thereon describe the intention to approve it, it logically follows that the intent to approve the acquisition which is the subject of the notice may be formed in a closed session.

[4] Plaintiff also contends that the County Board of Commissioners violated the Open Meetings Law by failing to keep "full and accurate minutes" of its closed meetings held after 1 October 1994. N.C.G.S. § 143-318.10(e) provides: "Every public body shall keep full and accurate minutes of all official meetings, including any closed sessions held pursuant to G.S. 143-318.11." Plaintiff argues the evidence shows that on 8 December 1994 and 2 March 1995, the County Commissioners met in closed session to discuss matters allegedly exempted from open meetings requirements by N.C.G.S. § 143-318.11(a)(4), and the minutes of both sessions only state "discussion."

This appears to be a question of first impression for this Court. However, the United States Court of Appeals for the Fourth Circuit, in *Town of Graham v. Karpark Corp.*, 194 F.2d 616 (4th Cir. 1952), has interpreted a North Carolina statute requiring "full and accurate" minutes. The court stated:

The statutes of North Carolina require that a contract by a municipality involving as much as two hundred dollars be in writing, signed by the officer authorized to execute it and approved by the governing body. G.S. § 160-279. And to be valid it must be authorized by ordinance or resolution adopted by the board of commissioners. G.S. § 160-332. It is not made a condition of validity, however, that it be entered in the minutes of the board. The requirement of G.S. § 160-269 that a full and accurate journal of the proceedings be kept would seem to be merely directory and not a condition precedent to the validity of a contract regularly entered into by the municipality.

*Id.* at 621-22. Further, an Institute of Government publication contains the following, which, while not authoritative, is instructive:

**121. [D]oes [the statutory requirement that "full and accurate minutes" of closed sessions be kept] mean that the minutes must show what everyone said at the closed session?**

No. The phrase "full and accurate minutes" is also used for the statutory requirement that *city councils* and *boards of county commissioners* keep minutes of all their meetings, and it has a settled meaning in that existing context. Presumably the General Assembly intended the same meaning for the phrase in the open-meetings law. Under the existing interpretation of the phrase, the purpose of minutes is to provide a record of the *actions taken* by a board and evidence that the actions were taken according to proper procedures. If no action is taken, no record (other than the fact the meeting occurred) is necessary. Thus if the public body uses the closed session *only for discussion* and takes no action, *nothing* need appear in the minutes other than the fact that the meeting was held. If some action is taken, of course, the minutes should reflect that fact.

David M. Lawrence, *Open Meetings and Local Governments in North Carolina* 29 (4th ed. 1994) (emphasis added). This accords with the common understanding of the purpose of minutes. Generally, "they should contain mainly a record of what was *done* at the meeting, not what was *said* by the members." Henry M. Robert, *Robert's Rules of Order Newly Revised* § 47, at 458 (9th ed. 1990). Their purpose is to reflect matters such as motions made, the movant, points of order, and appeals—not to show discussion or absence of action. *See id.* at 459-60.

**MAREADY v. CITY OF WINSTON-SALEM**

[342 N.C. 708 (1996)]

In this case, no action was taken at the closed meetings. Therefore, the cursory reference to "discussion" in the minutes sufficed, and we perceive no violation of the "full and accurate minutes" requirement of N.C.G.S. § 143-318.10(e).

In summary, we conclude that the trial court's findings of fact are supported by competent evidence and that these findings support its conclusion that defendants did not violate the Open Meetings Law. This assignment of error is therefore overruled.

For the foregoing reasons, we reverse the trial court's rulings that N.C.G.S. § 158-7.1 violates Article V, Section 2(1) of the North Carolina Constitution and is impermissibly vague and ambiguous. We affirm the trial court's ruling that defendants did not violate the Open Meetings Law.

AFFIRMED IN PART; REVERSED IN PART.

Justice ORR dissenting.

At issue in this case is the City of Winston-Salem and Forsyth County's authorization, pursuant to N.C.G.S. § 158-7.1, to expend public funds directly to, and for the benefit of, selected private businesses as an inducement to these businesses to either expand or locate in the community. The majority opinion sanctions this practice on the theory that since jobs were created and the tax base increased by virtue of the inducements, the expenditures, totalling $13.2 million for the twenty-four challenged projects, were for a public purpose as required by Article V, Section 2 of the North Carolina Constitution. As a result, it appears to me that little remains of the public purpose constitutional restraint on governmental power to spend tax revenues collected from the public. Because I believe that the majority's holding in this case is (1) based on a theory unsupported by the evidence, and (2) contrary to established precedent interpreting the intent of the North Carolina Constitution, I respectfully dissent.

The logic upon which the majority opinion rests its conclusion that the expenditure of these funds was for a public purpose can be stated as follows: The creation of new jobs and an increase in the tax base *ipso facto* benefits the general public. Therefore, local government expenditure of tax dollars to a private business for its private benefit in order to induce the business to either expand or locate in the community is for a public purpose if it creates new jobs and increases the tax base.

MAREADY v. CITY OF WINSTON-SALEM

[342 N.C. 708 (1996)]

The fallacy of this reasoning begins with the assumption that new jobs and a higher tax base automatically result in significant benefit to the public. The trial court's finding of fact number 9 addresses the factual and evidentiary failings of this assumption:

9. No evidence was presented of economic distress in the City and County from 1990 to the present time. During this period of time, based on the evidence presented, the unemployment rate in Forsyth County was [as] follows:

| January, 1993 | 4.9% |
| June, 1993 | 5.0% |
| December, 1993 | 3.1% |
| January, 1994 | 4.1% |
| June, 1994 | 4.0% |
| December, 1994 | 2.5% |
| January, 1995 | 3.7% |
| June, 1995 | 4.1% |

No evidence was presented that incentives paid or committed by the City and County improved the unemployment rate or that they otherwise resulted in meaningful economic enhancement. No evidence was presented that the incentive grants made by the City and County reduced the net cost of government or resulted in a reduction in the amount or rate of property taxes paid by, or the level of services rendered to, the citizens of Winston-Salem and/or Forsyth County.

The argument presented by the defendants relies on the evidence of a projected total from the twenty-four projects of 5,532 new jobs and a projected tax base increase of $238,593,000. As impressive as those numbers appear, they must be viewed in the proper context. Based on January 1995 estimates, the work force in Forsyth County totalled 152,030, with an estimated 145,840 employed. Therefore, even if all of the projected 5,532 new jobs came to fruition, it still represents less than four percent of the employed work force in the county. In addition, an estimated eighty-five percent of those new jobs went to individuals already in Forsyth County, many of whom were presumably employed with other businesses. With respect to the increased tax base, the County's 1995 property tax base was valued at $15,633,231,770. The increase in the property tax base projected by defendants from the projects is $238,593,000, or slightly more than one and one-half percent of the overall tax base. Therefore, the conclusion that there is anything more than limited benefit accruing to the public in this case cannot be supported by the existing evidence.

## MAREADY v. CITY OF WINSTON-SALEM

[342 N.C. 708 (1996)]

Although there is undoubtedly some benefit to the general public, as noted with approval in the majority opinion, "direct state aid to a private enterprise, with only limited benefit accruing to the public, contravenes fundamental constitutional precepts." As Justice Sharp (later Chief Justice) stated in *Mitchell v. North Carolina Indus. Dev. Fin. Auth.*, 273 N.C. 137, 159 S.E.2d 745 (1968):

It is clear, however, that for a use to be public its benefits must be in common and not for particular persons, interests, or estates; the ultimate net gain or advantage must be the public's as contradistinguished from that of an individual or private entity. *Briggs v. Raleigh*, 195 N.C. 223, 141 S.E. 597 [(1928)].

*Mitchell*, 273 N.C. at 144, 159 S.E.2d at 750.

In applying the above test, and juxtaposing the alleged benefits to the public vis à vis the benefits to the private enterprises, it is useful to examine the following table that was included in the trial court's judgment:

| RECIPIENT OF FUNDS OR BENEFITS/DATE | AMOUNT OF CITY INCENTIVE AUTHORIZED | AMOUNT OF COUNTY INCENTIVE AUTHORIZED | PROJECTED TAX BASE CREATED | PROJECTED NEW JOBS | STATED PURPOSE OF GRANT |
|---|---|---|---|---|---|
| Texwipe Co. 1990 | $ 14,675 | $ 60,000 | $ 1,000,000 | 150 | On-the-job training |
| Lee Company 8/1991 | 880,000 | 283,000 | 12,000,000 | 840 | Construction of road; development of land at 311 Centre on property owned by Winston-Salem Business, Inc., on-the-job training |
| Cluett Corporation 9/1992 | 20,000 | 0 | 3,500,000 | 180 | Utilities connections |
| Champion Products 4/1993 | 75,000 | 75,000 | 6,000,000 | 350 | Site improvements; on-the-job training |
| Omni Tool 7/1991 | 0 | 45,000 | 651,000 | 32 | On-the-job training |
| Somar Co. 10/1991 | 10,000 | 10,000 | (leased sq. ft.) | 196 | On-the-job training |
| Tara Corp. 7/1992 | 36,462 | 0 | 850,000 | 10 | Financing of land purchase |
| Central Air Conditioning Dist. 1/1992 | 170,000 | 50,000 | 1,100,000 | 20 | Financing of land purchase; expansion; relocating utilities on site |
| Southern National Bank 11/1992 | 473,500 | 473,500 | (leased 90,000 sq. ft.) | 289 | Rent of headquarters building; parking fees; spousal relocation assistance |
| Sara Lee Knitwear 2/1993 | 150,000 | 150,000 | 16,412,000 | 250 | Construction of a road |
| Wake Forest University 3/1993 (Pepsi Cola) | 500,000 | 500,000 | 11,000,000 | 1,000 | Upfitting of rental property for tenant of Wake Forest; moving and other expenses to move one tenant out to make room for another |
| Siecor Corp. 3/1993 | 1,233,000 | 1,133,000 | 32,000,000 | 200 | Site grading and preparation; donation of land developed by Winston-Salem Business, Inc.—Centre 311 |

## MAREADY v. CITY OF WINSTON-SALEM

[342 N.C. 708 (1996)]

| RECIPIENT OF FUNDS OR BENEFITS/DATE | AMOUNT OF CITY INCENTIVE AUTHORIZED | AMOUNT OF COUNTY INCENTIVE AUTHORIZED | PROJECTED TAX BASE CREATED | PROJECTED NEW JOBS | STATED PURPOSE OF GRANT |
|---|---|---|---|---|---|
| R J. Reynolds Tobacco Co. 5/1994 | 250,000 | 250,000 | (leased 57,000 sq. ft.) | 250 | Demolition work and building of parking lot for use by tenant, Wachovia Credit Operations |
| Dize Company 1993 | 25,000 | 0 | 0 | 50 | On-the-job training |
| Ilco-Unican Company 1994 | 20,000 | 0 | 4,000,000 | 35 | On-the-job-training |
| Amp, Incorporated 10/1994 | 35,000 | 35,000 | 7,000,000 | 80 | Widening of road |
| Wachovia Corporation 8/1994 | 4,976,000+ | 0 | 80,000,000 | 300 | Construction of parking deck and related construction |
| HDM Partners, Ltd. 9/1993 | 94,000 | 25,000 | 3,480,000 | 100 | Construction of road and site improvements |
| Chesapeake Display and Packaging 5/1993 | 0 | 200,000 | 6,000,000 | 150 | Facility upfit and site improvements |
| Standard Commercial 2/1994 | 0 | 200,000 | 12,500,000 | 40 | Road construction; utilities construction |
| Dudley Products 7/1994 | 0 | 120,000 | 2,500,000 | 100 | Site improvements |
| Hayward Industries 1/1995 | 0 | 415,000 | 32,000,000 | 770 | Site improvements |
| Pope Companies (Draper Company) 4/1995 | 0 | 20,000 | 2,100,000 | 75 | Road construction |
| Adele Knits 7/1995 | 120,000 | 120,000 | 4,500,000 | 65 | Facility upfit |
| TOTAL | $9,082,637 | $4,164,5000 [sic] | $238,593,000 | 5,532 | |

In examining the stated purposes of the grants, it is obvious that the $13.2 million was authorized for the specific benefit of the companies in question. The money expended was directly for the use of these private companies to pay for such activities as on-the-job training for employees, road construction, site improvements, financing of land purchases, upfitting of the facilities, and even spousal relocation assistance. In weighing these direct "private benefits" paid for by the taxpayers against the limited "public benefits," only one conclusion can be reached—that the trial court correctly held that the expenditures in question were not for a public purpose. The opposite conclusion reached by the majority can be reached only by ignoring the weight of the private benefits and relying instead on the assumption that simply creating new jobs and increasing the tax base is a public purpose that justifies the payment of tax dollars to the private sector. As previously noted, there is simply no evidence to support such a conclusion, and the majority's position must fail.

The second aspect of the majority's opinion with which I disagree is its assertion that *Mitchell* and *Stanley v. Department of Conservation & Dev.*, 284 N.C. 15, 199 S.E.2d 641 (1973), do not control this decision and are distinguishable. In reaching its conclusion, the majority distinguishes one aspect of *Mitchell* from the instant case by observing that the General Assembly unenthusiastically passed the legislation in question in *Mitchell*, declaring it to be "bad policy." Granted, our legislature has not expressly stated that the practice of granting economic incentives as authorized by N.C.G.S. § 158-7.1 is "bad policy," but it is evident from a wide range of sources included in the record that the primary argument for such assistance to private industry is that "all the states are doing it" and, thus, that North Carolina must do it too in order to be competitive. The necessity of forcing communities and states to bid against each other with promises of government subsidies in an effort to induce industries to expand or locate in the community is a practice just as distasteful as the practice objected to in *Mitchell*. Therefore, the fact that the General Assembly was unenthusiastic in passing the legislation in question in *Mitchell* in no way lessens the impact of *Mitchell*.

Two other rationales espoused by the majority for distinguishing *Mitchell* (and also *Stanley*) from the case *sub judice* arise out of the passage of two 1973 amendments to the North Carolina Constitution. The first amendment, Article V, Section 9, allows counties to create authorities to issue revenue bonds for industrial and pollution control facilities. N.C. Const. art. V, § 9. As acknowledged by the majority, the first amendment was narrowly tailored to address a specific situation, but the majority claims that it nonetheless diminishes the significance of *Mitchell* and *Stanley*. For whatever diminishment there may be, nothing appears to indicate nor does the majority contend that *Mitchell* and *Stanley* were not correctly decided as a matter of law, nor does the majority contend that the principles of law dealing with the public purpose doctrine are no longer valid.

The second amendment, Article V, Section 2(7), allows the government to "contract with and appropriate money to any person, association, or corporation for the accomplishment of public purposes only." N.C. Const. art V, § 2(7). I find the majority's reliance on Article V, Section 2(7) to be of no significance in that a straightforward reading of the amendment simply permits the payment of tax dollars to private enterprise "for the accomplishment of [a] public purpose[]." As previously noted, unless one is willing to conclude that any expenditure that creates jobs and increases the tax base is "a

public purpose," that amendment has no substantive effect on the holdings in *Mitchell* and *Stanley*, and thus not on this case. In fact, the amendment merely allows government to perform a public purpose by contracting with the private sector to actually accomplish the public purpose.

The majority also relies on a "changing times" theory to ignore the law as set forth in *Mitchell* and *Stanley*. While economic times have changed and will continue to change, the philosophy that constitutional interpretation and application are subject to the whims of "everybody's doing it" cannot be sustained.

Finally, the majority chooses to ignore the principles set forth in the *Stanley* case for determining what is a public purpose. Justice Sharp, writing for a unanimous Court, stated:

> Because the concept of public purpose must expand to meet the necessities of changed times and conditions, this Court has not attempted to confine public purpose by judicial definition but has "left each case to be determined by its own peculiar circumstances as from time to time it arises." *Keeter v. Lake Lure*, [264 N.C. 252, 264, 141 S.E.2d 634, 643 (1965)]. Our reports contain extensive philosophizing and many decisions on the subject. Most recently we have considered the question whether a purpose was public or private in *Foster v. Medical Care Comm.*, 283 N.C. 110, 195 S.E.2d 517 (1973); *Martin v. Housing Corp.*, [277 N.C. 29, 175 S.E.2d 655 (1970)]; *Redevelopment Comm. v. Guilford County*, [274 N.C. 585, 164 S.E.2d 476 (1968)]; *Mitchell v. Financing Authority*, [273 N.C. 137, 159 S.E.2d 745]. These decisions, and the cases on which they are based, establish the following principles:

> (1) An activity cannot be for a public purpose unless it is properly the "business of government," and it is not a function of government either to engage in private business itself or to aid particular business ventures. *See* Note, 49 N.C. L. Rev. 830, 833 (1971). It is only when private enterprise has demonstrated its inability or unwillingness to meet a public necessity that government is permitted to invade the private sector. In *Martin v. Housing Corp.*, [277 N.C. 29, 175 S.E.2d 655], and *Wells v. Housing Authority*, [213 N.C. 744, 197 S.E. 693 (1938)], revenue bonds issued by two public housing agencies for the purpose of providing housing for low-income tenants were held to be for a public purpose. Governmental activity in that field was not an

intrusion upon private enterprise, which had eschewed the field. Further, the primary benefits passed directly from the public agency to the public and not to a private intermediary.

(2) Aid to a private concern by the use of public money or by tax-exempt revenue-bond financing is not justified by the incidental advantage to the public which results from the promotion and prosperity of private enterprises.

(3) In determining what is a public purpose the courts look not only to the end sought to be attained but also "to the means to be used." *Turner v. Reidsville*, 224 N.C. 42, 44, 29 S.E.2d 211, 213 (1944). *See Wells v. Housing Authority*, [213 N.C. at 750, 197 S.E. at 697]. Direct assistance to a private entity may not be the means used to effect a public purpose. "It is the essential character of the direct object of the expenditure which must determine its validity, and not the . . . degree to which the general advantage of the community, and thus the public welfare, may be ultimately benefited by their promotion." 63 Am. Jur. 2d *Public Funds* § 59 (1972).

*Stanley*, 284 N.C. at 33-34, 199 S.E.2d at 653-54 (alteration in original).

I acknowledge that in *Madison Cablevision v. City of Morganton*, 325 N.C. 634, 386 S.E.2d 200 (1989), this Court disavowed a portion of the language in the first prong of the *Stanley* test above: "It is only when private enterprise has demonstrated its inability or unwillingness to meet a public necessity that government is permitted to invade the private sector." *Id.* at 647, 386 S.E.2d at 207. However, the *Madison* Court did not disavow any other portion of the quote from *Stanley*. In fact, *Madison* relied on an abbreviated statement of the principles set out in *Stanley* for determining whether a particular undertaking by a local government is for a public purpose: "(1) it involves a reasonable connection with the convenience and necessity of the particular municipality, *Airport Authority v. Johnson*, 226 N.C. 1, 36 S.E.2d 803 (1946); and (2) *the activity benefits the public generally, as opposed to special interests or persons*, *Martin v. Housing Corp.*, 277 N.C. 29, 175 S.E.2d 665." *Madison*, 325 N.C. at 646, 386 S.E.2d at 207 (emphasis added).

I further acknowledge that the sentence in the third prong of the *Stanley* test—"Direct assistance to a private entity may not be the means used to effect a public purpose," *Stanley*, 284 N.C. at 34, 199

S.E.2d at 653—is no longer accurate in light of the passage of Article V, Section 2(7) permitting such assistance. However, the ultimate test for determining public purpose as set forth in *Mitchell* and *Stanley* and even in *Madison* remains basically the same and applicable to this case: Does the expenditure benefit the public generally as opposed to special interests or persons? As stated in the second prong of the *Stanley* test, "[a]id to a private concern by the use of public money . . . is not justified by the incidental advantage to the public which results from the promotion and prosperity of private enterprise." *Id.* at 33, 199 S.E.2d at 653. The facts of this case fit squarely into this principle and thus, compel a finding that the trial court was correct.

Finally, many of the arguments presented to this Court rest on public policy. Advocates for these business incentives contend that without them, North Carolina will be at a significant competitive disadvantage in keeping and recruiting private industry. They further contend that the economic well-being of our state and its citizens is dependent on the continued utilization of this practice. These arguments are compelling, and even plaintiff admits that a public purpose is served by general economic development and recruitment of industry. However, plaintiff and those supporting his point of view argue that direct grants to specific, selected businesses go beyond the acceptable bounds of public purpose expenditures for economic development. Instead, they say that this is selected corporate welfare to some of the largest and most prosperous companies in our State and in the country. Moreover, these opponents contend that the grants are not equitably applied because they generally favor the larger companies and projects and, in this case, under the County's Economic Incentives Program Guidelines, completely eliminate retail operations from being considered. In challenging the actual public benefit, a question also is raised about the economic loss and devastation to smaller North Carolina communities that lose valued industry to larger, wealthier areas. For example, the move of Southern National Bank headquarters from Lumberton to Winston-Salem undoubtedly adversely affected Lumberton.

Also troubling is the question of limits under the majority's theory. If it is an acceptable public purpose to spend tax dollars specifically for relocation expenses to benefit the spouses of corporate executives moving to the community in finding new jobs or for parking decks that benefit only the employees of the favored company,

then what can a government not do if the end result will entice a company to produce new jobs and raise the tax base? If a potential corporate entity is considering a move to Winston-Salem but will only come if country club memberships are provided for its executives, do we sanction the use of tax revenue to facilitate the move? I would hope not, but under the holding of the majority opinion, I see no grounds for challenging such an expenditure provided that, as a result of such a grant, the company promises to create new jobs, and an increased tax base is projected.

In conclusion, for the foregoing reasons and for the reasons stated by the trial court, N.C.G.S. § 158-7.1, as broadly interpreted and applied by the majority, is unconstitutional on its face and as applied because it is impermissibly vague, ambiguous, and without reasonably objective standards and because it violates the public purpose clause of the North Carolina Constitution. Therefore, I would affirm the decision of the trial court.

In addition, even though I concur with the majority on the issue of the open meetings law violation, I am compelled to observe that although the open meetings law statutory exemptions may technically cover the practice complained of, what transpired appears to violate the spirit of the law and result in the abuses the law is intended to prevent.

JUSTICE LAKE joins in this dissenting opinion.